IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| RANDALL TODD ROYER, ) | |
| ) | Civil No.      1:14cv801 |
| Petitioner, ) | |
| ) | Criminal No.  1:03cr296 |
| v. ) | |
| ) | |
| ERIC D. WILSON, ) | |
| ) | |
| Respondent. ) | |

RESPONSE TO PETITION FOR A WRIT OF HABEAS CORPUS

Randall Royer's petition for a writ of habeas corpus should be denied. Regardless of any other reason, Royer is not entitled to any relief because - - as this Court expressly found in February 2012 when it denied Royer's motion for relief under 28 U.S.C. § 2255 - - he cannot establish his actual innocence to the charges against him that were dropped in connection with the entry of his guilty plea in 2004.

Background[1]

On June 25, 2003, a grand jury returned an indictment charging Royer and ten other individuals with 41 counts, including conspiracy under 18 U.S.C. § 371, acquisition of a firearm with intent to engage in a crime of violence, and violations of the Neutrality Act, 18 U.S.C. § 960, arising out of their preparations for violent jihad overseas. Those preparations included participation in simulated combat training, procurement of weapons such as AK-47's, and travel to Pakistan to receive military training with Lashkar-e-Taiba ("LET"), a paramilitary

---

[1] The facts set forth in this "Background" section come directly from the section of the same name in this Court's Memorandum Opinion of February 12, 2012, denying Royer's motion for relief under 28 U.S.C. § 2255.

organization that the United States Department of State subsequently designated a terrorist organization.

In August and September of 2003, four of the co-conspirators, Donald Thomas Surratt, Yong Ki Kwon ("Kwon"), Muhammed Aatique ("Aatique"), and Khwaja Mahmood Hasan ("Hasan"), entered into plea agreements with the Government and pled guilty to various charges of the indictment. As a result of new information obtained from these four co-conspirators, who were cooperating with the Government pursuant to their plea agreements, the Government obtained a 32-count superseding indictment against Royer and the remaining defendants on September 25, 2003. Specifically, Royer was charged in 14 counts with various conspiracies, including to levy war against the United States and to engage in armed hostility against the United States, in violation of 18 U.S.C. §§ 2384 and 2390; and to contribute material support to the Taliban, al Qaeda, and LET (counts 1-5); as well as various firearm offenses in violation of 18 U.S.C. § 924 (counts 11, 18, 23-27); and with aiding and abetting and substantive violations of the Neutrality Act (counts 7, 10).

On January 16, 2004, Royer, who was represented by counsel, pled guilty to a two-count criminal information under a written plea agreement. Count One of the criminal information charged that, in violation of 18 U.S.C. § 924(c), Royer:

> Did unlawfully and knowingly aid and abet the use and discharge of a semiautomatic pistol by Masoud Khan, Yong Kwon, Mohammad Aatique, and Khwaja Hasan in Pakistan during, in relation to, and in furtherance of . . . the conspiracy charged in Count One of the Indictment. . . .

Count One of the superseding indictment, to which Count One of the criminal information referred, charged a conspiracy to commit five offenses against the United States and alleged two separate objects of that conspiracy: 1) to prepare for and take part in military expeditions to be carried on from the United States against the territory and dominion of foreign

2

states, districts, and peoples with whom the United States was at peace, in violation of the Neutrality Act, 18 U.S.C. § 960, and 2) to enlist and engage with intent to serve in armed hostility against the United States, in violation of 18 U.S.C. § 2390.[2] The penalties to which Royer was exposed under Count One of the criminal information included a mandatory minimum sentence of ten years to life imprisonment.

Count Two of the Criminal Information alleged aiding and abetting the carrying of an explosive during the commission of a felony which may be prosecuted in a United States court, in violation of 18 U.S.C. §§ 844(h)(2), 2, and 3238. That offense carried, among other penalties, a mandatory term of incarceration of ten years, which had to run consecutive to the sentence on Count One.

In the Statement of Facts attached to the plea agreement, Royer admitted that he had been highly familiar with LET for many years before the indictment was filed and that he was instrumental in his co-conspirators' ability to get accepted into the LET training camp. Specifically, Royer admitted that in early April 2000, he entered Pakistan with the intention of receiving training to fight in Chechnya. Instead of traveling to Chechnya, he remained in Lahore, Pakistan to assist with LET's publicity efforts and, in that vein, created LET's online newsletter and Yahoo! group, which disseminated information about LET's activities, including descriptions of attacks on Indian soldiers and Indian government buildings. Before leaving Pakistan in early May 2000, Royer also visited LET training camps and went to the front line in Kashmir, where he shot at Indian positions with a machine gun.

---

[2] In his guilty plea, Royer admitted his participation in at least in the second object of the conspiracy, if not also in the first.

3

Upon his return to the United States, Royer continued editing LET's electronic newsletter and began a new Yahoo! group supporting the organization. He also encouraged others to train with LET in Lahore and described his experience firing at Indian positions. He began playing paintball with his eventual co-conspirators in 2000. During these paintball games, jihad was a frequent topic of conversation. Royer eventually contacted LET to secure a place at a training camp for Ibrahim Ahmed Al-Hamdi ("Al-Hamdi"), who went on a mission with an LET group that fired rocket-propelled grenades and automatic weapons at Indian troops in Kashmir.

The following year, while in Saudi Arabia on Hajj, Royer introduced his companions, including Kwon, to an LET leader for the purpose of providing them information about the LET. Royer also purchased "videotapes featuring footage of jihad in a variety of places," including Kashmir, and later showed these videos to members of his paintball group. As he had for Al-Hamdi, Royer contacted LET on behalf of Aatique and Seifullah Chapman, so that these men could also gain access to the training camp. Both men soon thereafter went to Pakistan, trained with LET, and described their experiences to Royer upon their return.

During a group dinner at Kwon's house a few days after the September 11, 2001 attacks, a guest expressed concern about a backlash against Muslims and encouraged the attendees to "be with the mujahideen," a term referring to "those who are engaged in a physical fight in support of their religion." Royer announced that he could help interested persons gain entry into an LET camp to get the training they would need to become mujahideen.

Three days later, Khan left for Pakistan where he obtained training from LET. Additionally, Royer met Kwon and Hasan at a 7-11 store in Virginia, purchased a telephone card, and called an LET representative to give that individual physical descriptions of Kwon and Hasan, who departed on September 20, 2011 for Pakistan with Royer's instructions as to how to

4

find LET there. Meanwhile, Royer was encouraging other members of the paintball group to go to LET as well.

On September 28, 2001, the FBI contacted one of Royer's former attorneys to inquire whether Royer would speak with the FBI. Instead of speaking with agents, Royer, who had already been planning to go to Pakistan, decided to depart immediately and left on October 1, 2001. Because he had no time to obtain a Pakistani visa, he booked a flight to Bosnia as an intermediate stop, which is where his wife and children joined him one week later. Once in Bosnia, Royer was unable to obtain a Pakistani visa, but via email, he continued to encourage members of the paintball group to go to LET. He also posted a message to one of his electronic lists praising John Walker-Lindh, known as the "American Taliban," following Walker-Lindh's capture in Afghanistan.

Meanwhile, Kwon, Hasan, and Khan, who had gotten into an LET camp through Royer's assistance, were receiving training in firing weapons, including a machine gun and a rocket-propelled grenade.

In April 2002, Royer returned to the United States. In March 2003, law enforcement executed a search warrant of his home and seized a copy of a United States Department of the Army field manual entitled "Guerrilla Warfare and Special Forces Operations," a contact number for LET, and one-minute movies produced by a Russian firearms manufacturer depicting usage of AK-47-style rifles with silencers and grenade launchers.

Based on those facts and Royer's representations during the plea colloquy, the Court accepted his guilty plea. On April 9, 2004, Royer was sentenced to 20 years imprisonment, consisting of 120 months on Count One and 120 months on Count Two, to be served

consecutively, as well as three years of supervised release on each count. He did not appeal his conviction or sentence, which became final on April 9, 2004.

Khan and three co-defendants were tried in a bench trial that began on February 9, 2004 and included testimony from Kwon, Aatique, and Hasan.[3] On March 4, 2004, the Court found Khan guilty of eight counts of the indictment, Chapman guilty of five, and Hammad guilty of three counts of the indictment. It dismissed all charges against Caliph.

On March 16, 2009, Royer filed a motion to vacate his sentence under 28 U.S.C. § 2255. That motion was denied on February 15, 2012, on the grounds that it was untimely. The Court held, however, that the motion would fail even if it was not untimely, because Royer was unable to establish his actual innocence of the offense to which he pled guilty, or of the charges that were dropped in consideration for his guilty plea.

<u>Argument</u>

Royer argues that the 924(c) charge to which he pled guilty is invalid because of the Fourth Circuit recently narrowed its interpretation of "crimes of violence" that may predicate convictions under Section 924(c). His argument is unavailing for a variety of reasons. Even if he fulfilled the criteria of the "savings" clause from Section 2255, it would not matter because - - as this Court already found - - his guilty plea foreclosed collateral review of the convictions he admitted as part of a plea bargain in the course of which the government dropped other serious charges of which he was not innocent. In any event, the offense to which he pled guilty is a crime of violence under the recent interpretations anyway.

---

[3] Royer agreed to cooperate in his plea agreement and testified in the grand jury about the dinner at Kwon's house after the 9/11 attacks, but his cooperation was inconsistent and he ultimately was not called to testify in the trial.

6

I. <u>Jurisdiction</u>[4]

The primary means to collaterally attack a federal conviction and sentence is through a motion pursuant to 28 U.S.C. § 2255. Section 2255 provides that a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Section 2255(e) states:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is in adequate or ineffective to test the legality of his detention.

Section 2255 "was intended to replace § 2241 in the vast majority of cases" for federal prisoners. *San-Miguel v. Dove*, 291 F.3d 257, 260-61 (4th Cir. 2002). By its very terms, the sole exception to the exclusivity of the Section 2255 remedy is where that remedy is "inadequate or ineffective to test the legality of [the federal prisoner's] detention." 28 U.S.C. § 2255(e). *See San-Miguel*, 291 F.3d at 261 ("petitioners are prevented from filing a § 2241 petition unless they fall within the savings clause of § 2255"). This exception, known as Section 2255's "savings clause," is the only portal through which a federal prisoner may challenge the legality of his detention outside of Section 2255, and it permits federal prisoners to file habeas petitions under Section 2241 only under very limited circumstances.

---

[4] Consideration of the jurisdictional issues are likely moot because this Court already found that Royer's guilty plea foreclosed collateral review of the convictions he admitted as part of a plea bargain in the course of which the government dropped other serious charges of which he was not innocent. We raise them here for the Court's convenience, but the most straightforward way of resolving the instant petition is likely to assume without deciding that the Court has jurisdiction over the petition, and then deny it for failure to establish actual innocence.

7

Royer attempts to invoke the "savings" clause of Section 2255 to establish jurisdiction in this Court. To invoke the savings clause and proceed under Section 2241, however, he bears the burden of showing that a motion under Section 2255 is inadequate or ineffective to test the legality of his detention. *Charles v. Chandler*, 180 F.3d 753, 756 (6th Cir. 1999). Yet, "[i]t is beyond question that § 2255 is not inadequate or ineffective merely because an individual is unable to obtain relief under that provision." *In re Jones*, 226 F.3d 328, 333 (4th Cir. 2000). Nor is a § 2255 motion inadequate or ineffective because a person may be procedurally barred from filing the motion. *In re Vial*, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997).

It is well established that Section 2255 is inadequate or ineffective to test the legality of Royer's detention only if the following three criteria are established:

> (1) at the time of conviction, settled law of the Fourth Circuit or the Supreme Court established the legality of the conviction;
>
> (2) subsequent to Royer's direct appeal and the disposition of his first § 2255 motion, the substantive law changed such that the conduct of which he was convicted is deemed not to be criminal; and
>
> (3) Royer cannot satisfy the gatekeeping provisions of § 2255 because the new rule is not one of constitutional law.

*In re Jones*, 226 F.3d at 333-34. Even if Royer can meet the third prong of the Jones test, he cannot meet the first two.

### A. In 2004, There Existed No Settled Law That Established the Legality of Royer's Conviction

Section 2255 is only inadequate or ineffective to test the legality of Royer's detention - - and, therefore, Section 2241 is only available for him to do so now - - if at the time of his conviction, settled law of the Fourth Circuit or the Supreme Court established the legality of the conviction. At the time of his guilty plea in 2004, however, the question of whether a violation

8

of the Neutrality Act constituted a "crime of violence" for purposes of Section 924(c) was hardly settled law; indeed, it appeared to be one of first impression.

When Royer and his co-defendants moved to dismiss the 924(c) charges in the superseding indictment in 2003 on the grounds that the predicate offenses were not crimes of violence, the parties submitted briefs that found no prior case in which the precise question of whether the Neutrality Act was a "crime of violence" for purposes of Section 924(c) arose. This Court then ruled that such a violation was, in fact, a "crime of violence." The issue was not raised on appeal by the defendants who were convicted at trial, and the Fourth Circuit did not opine on the issue. *United States v. Khan*, 461 F.3d 477 (4th Cir. 2006). In short, no settled law of the Fourth Circuit or the Supreme Court established that a violation of the Neutrality Act was a "crime of violence" in 2004, so Royer cannot meet the first of the three criteria set forth in *Jones*.

Ten years later, there still is no authority outside of this Court's original ruling with respect to whether a violation of the Neutrality Act constitutes a "crime of violence" for purposes of Section 924(c). Inasmuch as the law in the Fourth Circuit with respect to whether a Neutrality Act violation is a crime of violence has not changed since Royer entered his guilty plea in 2004, he cannot establish the third criterion either. As a result, he is not entitled to use the "savings clause" of § 2255 to seek relief now.

  B.  The Substantive Law Has Not Changed Such That the Conduct
of Which Royer was Convicted is Deemed Not to Be Criminal

Regardless of whether the law was settled in 2004, Section 2241 cannot be available for Royer now unless, subsequent to his conviction, the substantive law changed such that the conduct of which he was convicted is deemed not to be criminal. That, however, did not happen.

Royer argues that the substantive law of what constitutes a crime of violence under Section 924(c) has changed such that the conduct to which he pled guilty is now deemed not to be criminal. In support of his argument, he cites to several Fourth Circuit cases that reflect that the test for determining whether an offense is a "crime of violence" is now a "categorical" test rather than a "modified categorical" test. But the law provided for a "categorical" test in 2003 when Royer and his co-defendants first moved to dismiss the Section 924(c) counts on the grounds that the Neutrality Act was not a crime of violence. Indeed, that is how *we* characterized the law when we briefed this issue in November 2003 in opposition to the pre-trial motions of Royer and his co-defendants:

> As Judge Ellis stated in *United States v. Lindh*:
>
>> In *United States v. Aragon*, 983 F.2d 1306, 1312 (4th Cir. 1993), the Fourth Circuit found that identical language in 18 U.S.C. § 16(b)
>>
>>> directs the court to look to the generic nature of an offense in deciding whether the offense is a 'crime of violence' .... [T]he language 'by its nature' relates to the *intrinsic* nature of the crime, not to the facts of each individual commission of the offense.
>>
>> (emphasis in the original). According to the Fourth Circuit, the language of Section 16(b) "mandates that the court embark upon a categorical approach to determine whether a particular crime, 'by its nature,' qualifies as a 'crime of violence.'" *Aragon*, 983 F.2d at 1313; *see also Taylor v. United States*, 495 U.S. 575, 109 L. Ed. 2d 607, 110 S. Ct. 2143 (1990).

10

> [footnote omitted] Thus, whether Counts Four through Nine qualify as crimes of violence turns on whether they intrinsically, categorically, and by their nature involve a substantial risk of physical force against the person or property of another.
>
> *Lindh*, 212 F.Supp.2d at 578. Similarly, the issue in this case is whether Counts 1 through 5 and 7 through 10 "intrinsically, categorically, and by their nature involve a substantial risk of physical force against the person or property of another." Clearly, each of them does.

Government's Response to Motions Regarding Offenses that are Crimes of Violence for Purposes of 18 U.S.C. § 924(c), filed as Docket Item #285, in *United States v. Royer, et al.*, 1:03cr296 (November 14, 2003). Inasmuch as the law that Royer now says is new is identical to the law that we briefed 11 years ago, he cannot establish that the law changed between then and now.

As Royer points out in his pleading, the Fourth Circuit has issued two *en banc* decisions within the past three years on the applicability of the definition of "crime of violence." Those decisions, however, do not even suggest that Royer's 924(c) guilty plea was predicated on a crime that was anything other than a crime of violence.

First, in *United States v. Vann*, 660 F.3d 771 (4th Cir. 2011) (*en banc*), the Fourth Circuit concluded that the violations of a North Carolina Indecent Liberties statute did not constitute a "crime of violence" for the purposes of the Armed Career Criminal Act, codified at 18 U.S.C. § 924(e)(2)(B)(i). The Fourth Circuit judges appeared to be split on whether they should determine whether the Indecent Liberties statute constituted a "crime of violence" by the "categorical" approach or the "modified categorical" approach; either way, however, the result was the same: the violations did not constitute "crimes of violence." The Fourth Circuit's detailed analysis of the North Carolina Indecent Liberties statute, however, leaves no indication

11

that Royer's violation of the Neutrality Act was anything other than a crime of violence. And, just as in *Vann*, the result is the same under either analysis.

Second, in January 2014, the Fourth Circuit issued another *en banc* decision, in *United States v. Aparicio-Soria*, 740 F.3d 152 (4th Cir. 2014) (*en banc*). In that case, the Fourth Circuit determined that the Maryland crime of resisting arrest did not qualify as a "crime of violence" within the meaning of Section 2L1.2 of the Sentencing Guidelines. Once again, however, the Fourth Circuit's detailed analysis of a state statute leaves no indication that Royer's violation of the Neutrality Act was anything other than a crime of violence.

Moreover, *Aparacio-Sora* has no bearing on Royer's issue because the definition of "crime of violence" for purposes of Section 2L1.2 of the Sentencing Guidelines considered in that case is very different from the definition of "crime of violence" for purposes of Section 924(c). Indeed, crimes of violence for purposes of Section 2L1.2 are explicitly limited to certain listed offenses, and others that have as an element of the offense, the use, attempted use, or threatened use of physical force. *Aparicio-Soria*, 740 F.3d 152, 153.

In contrast, crimes of violence under Section 924(c) also include any felony offense that, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). As a result, a felony offense that does not have as an element the use, attempted, use, or threatened use of physical force - - but still involves a substantial risk that physical force against the person of another may be used in the course of committing the offense - - constitutes a "crime of violence" for purposes of Section 924(c), even though it does not constitute a crime of violence for purposes of Section 2L1.2 of the Sentencing Guidelines.

12

The language at issue in *Aparicio-Soria* is known as the "force" clause, and is applicable to Section 924(c) by reason of its inclusion at 18 U.S.C. § 924(c)(3)(A). In contrast, the clause at issue in Royer's case is known as the "residual" clause, and is codified at 18 U.S.C. § 924(c)(3)(B). *See Aparcio-Soria*, 740 F.3d at 154 n.1. Indeed, as a result of the distinction between the "force" clause and the "residual" clause, the cases cited by the government relying on the "residual clause" were deemed irrelevant to the *Aparicio-Soria*'s court's *en banc* decision. *Aparicio-Soria*, 740 F.3d at 156-57 ("*Wardrick* and *Jenkins* are irrelevant to this case" because the "residual" clause at issue in *United States v. Wardrick*, 350 F.3d 446 (4th Cir. 2003), and *United States v. Jenkins*, 631 F.3d 680 (4th Cir. 2011), appears in Section 924 but not in Section 2L1.2 of the Sentencing Guidelines).

That being said, Royer's argument that his count of conviction is now invalid because the Fourth Circuit narrowed the definition of "crime of violence" for purposes of Section 924(c) is unfounded. Any distinction between a "categorical" test and a "modified categorical" test is one without a difference for Royer, because the crime to which he pled guilty was a "crime of violence" under either test.

While the Fourth Circuit may have clarified the method of analyzing whether a particular offense is a "crime of violence" for purposes of Section 924(c) - - and adopted the rationale asserted by the government to be the law in this case in 2003 - - it never purported to rule that a violation of the Neutrality Act, 18 U.S.C. § 960, is not a crime of violence. Even under the newest Fourth Circuit cases, mounting a military expedition against a foreign country is an offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

13

According to Royer, the law now is:

> In summary, if the elements of an offense encompass any conduct that does not invariably involve a substantial risk that physical force will be used as a means to an end in the commission of the crime, it is not a categorical crime of violence under § 924(c) and cannot support a conviction under that statute.

Royer's Petition, at p. 9. Even under Royer's interpretation - - which, as noted above, is virtually the same as what the government contended in 2003 - - a violation of the Neutrality Act is necessarily a crime of violence.

A military or naval expedition or enterprise against the territory of another obviously involves a substantial risk that physical force will be used as a means to an end in the commission of the crime. After all, "a military expedition is a journey or voyage by a company or body of persons, having the position or characteristics of soldiers, for a specific warlike purpose. *Wiborg v. United States*, 163 U.S. 632, 650 (1896). "The term 'expedition' is used to signify a march or voyage with martial or hostile intentions." *Id.* There hardly could be a march or voyage against a foreign nation "for a specific warlike purpose" by "persons having the characteristics of soldiers" bearing "martial or hostile intentions" that did *not* involve a substantial risk that physical force will be used.

We do not deny that there are many means other than violence by which individuals might attempt to harm nations with whom we are at peace. These could include espionage, bribing foreign officials, or attempting to influence elections. Yet in the Neutrality Act, Congress chose to focus on a particular form of action, "a *military* or *naval* expedition or enterprise" to be carried out *"against"* a people with whom the United States is at peace. The

14

Case 1:03-cr-00296-LMB Document 779 Filed 08/05/14 Page 15 of 18 PageID# 203
Case 1:14-cv-00801-LMB-IDD Document 5 Filed 08/05/14 Page 15 of 18 PageID# 63

fact that Congress focused on martial actions against other lands and peoples provides compelling evidence that the Neutrality Act is a "crime of violence."

To violate the Neutrality Act, a defendant must begin (or furnish the money for, or take part in) a *military* expedition to be carried on "*against* the territory" of a country with whom the United States is at peace. 18 U.S.C. § 960 (emphasis added). Inasmuch as every Neutrality Act violation includes a *military* expedition *against* a country or people with whom we are at peace, every Neutrality Act violation is a felony that, by its nature, involves a substantial risk that physical force may be used against the person or property of another. As such, every violation of the Neutrality Act is necessarily "crime of violence" under 18 U.S.C. § 924(c)(3)(B) - - and this is true regardless of whether the question is analyzed under a "categorical" approach or a "modified categorical" approach. As a result, the change to a "categorical" approach in the analysis of whether a violation of the Neutrality Act is a "crime of violence" is not one that makes the conduct to which Royer admitted in his guilty plea anything other than criminal.

    III.    Royer Is Not Actually Innocent of Other More Serious Charges
            That the Government Dismissed in Exchange for His Guilty Plea

Regardless of whether the law was settled in 2004 or whether it has changed since, it is not necessary for this Court to revisit the issue of whether the Neutrality Act is a "crime of violence" in the first place. After all, Royer pled guilty to Count 1 of his Criminal Information in exchange for the government's agreement to drop more serious counts that clearly are "crimes of violence" for purposes of Section 924(c). As a result, to obtain relief now, Royer would have to show that he was actually innocent of those dropped charges as well - - but that he cannot do.

As this Court wrote in its Memorandum Opinion of February 15, 2012, denying Royer's Section 2255 motion, "on collateral review, claims that were not raised on appeal are deemed waived, and procedural default operates to bar such claims, unless the movant can establish cause and prejudice or, in the alternative, actual innocence." Memorandum Op., at 11. This Court further explained that the showing of actual innocence had to reach not only the charge to which Royer pled guilty, but also the charges that were dropped as part of his plea bargain:

> Actual innocence means factual innocence, not merely the legal insufficiency of a conviction or sentence, and where the Government has foregone more serious charges in the interest of a plea bargain, the movant must show actual innocence with respect to those charges as well. *See Bousley v. United States*, 523 U.S. 614, 623-24 (1998) . . . .

Id. at 12.

This rule takes into account the probability that the government would not have dropped good counts in plea negotiations if it had known that the remaining count was invalid, combined with the probability that the defendant likely would not have escaped punishment if the good counts had not been dismissed. If the good counts were as serious as the invalid count, then the defendant would have incurred at least as heavy as a punishment if the government had gone forward on the good counts as he did by pleading to the charge later determined to be invalid. *Lewis v. Peterson*, 329 F.3d 934, 936-37 (7th Cir. 2003).

In February 2012, this Court considered Royer's claims of actual innocence, and concluded that "there is no reasonable likelihood that Royer would have been acquitted of any count in the superseding indictment." Memorandum Op. at 24. This Court wrote:

> On this record, including the admissions Royer made under oath during his plea colloquy and in grand jury testimony, there is no reasonable likelihood that Royer would have been acquitted of any count in the

16

> superseding indictment. As a result of such convictions, he would have been sentenced to far more time in prison than he received. Therefore, he does not prevail on this issue.

*Id*.

In light of this Court's holding from February 2012, Royer can establish neither "prejudice" or actual innocence with respect to the serious charges that were dismissed as part of his plea agreement. As a result, he is entitled to no relief now regardless of whether or even how the Neutrality Act is evaluated as a "crime of violence."

## Conclusion

For the above reasons, Royer's petition should be denied.

                                       Respectfully submitted,

                                       Dana J. Boente
                                       United States Attorney

                                       _____/s_____
                                       Gordon D. Kromberg
                                       Assistant United States Attorney
                                       Virginia Bar No. 33676
                                       Assistant United States Attorney
                                       Attorney for the United States
                                       2100 Jamieson Avenue
                                       Alexandria, VA  22314
                                       (703) 299-3700
                                       (703) 837.8242 (fax)
                                       gordon.kromberg@usdoj.gov

CERTIFICATE OF SERVICE

I certify that on August 5, 2014, I will cause to be delivered by first class mail a copy of the attached RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS to:

> Randall Todd Royer
> Reg. No. 46812-083
> Federal Correctional Complex
> P.O Box 1000
> Petersburg, VA 23804

_____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov