IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | | |
|---|---|---|---|
| RANDALL TODD ROYER, | ) | | |
| | ) | Civil No. | 1:15cv1021 |
| Petitioner, | ) | | |
| | ) | Criminal No. | 1:03cr296 |
| v. | ) | | |
| | ) | | |
| ERIC D. WILSON, | ) | | |
| | ) | | |
| Respondent. | ) | | |

<u>RESPONSE TO PETITION FOR A WRIT OF HABEAS CORPUS</u>

Randall Royer's petition for a writ of habeas corpus should be denied.  The statute

defining the violation to which he pled guilty, 18 U.S.C. § 924(c)(3), lacks the unconstitutional

vagueness found in 18 U.S.C. § 924(e)(2), as explained in *Johnson v. United States,* 135 S.Ct.

2551 (2015).  As a result, the conduct to which Royer pled guilty is still deemed criminal.

Regardless of any other reason, however, Royer is not entitled to any relief now because - - as

this Court expressly found in February 2012 when it denied his motion for relief under 28 U.S.C.

§ 2255, and again in November 2014 and January 2015 when it denied his motion for relief

under 28 U.S.C. § 2241 - - he cannot establish his actual innocence to the charges against him

that were dropped in connection with the entry of his guilty plea in 2004.

<u>Background</u>

A.     <u>Facts and Procedural Background</u>

On June 25, 2003, a grand jury indicted Royer and ten others on various charges arising

out of their preparations for violent jihad overseas.  Those preparations included participation in

simulated combat training, procurement of weapons such as AK-47's, and travel to Pakistan to receive military training with Lashkar-e-Taiba ("LET"), a paramilitary organization that the United States Department of State subsequently designated a terrorist organization.[1]

In August and September of 2003, four of the conspirators, Donald Surratt, Yong Kwon Muhammed Aatique, and Khwaja Hasan, entered into plea agreements with the Government and pled guilty to various charges of the indictment. As a result of new information obtained from those cooperating defendants, the Government obtained a 32-count superseding indictment against Royer and the remaining defendants on September 25, 2003.  Specifically, Royer was charged in 14 counts with various conspiracies, including to levy war against the United States and to engage in armed hostility against the United States, in violation of 18 U.S.C. §§ 2384 and 2390; and to contribute material support to the Taliban, al Qaeda, and LET (counts 1-5); as well as various firearm offenses in violation of 18 U.S.C. § 924 (counts 11, 18, 23-27); and with aiding and abetting and substantive violations of the Neutrality Act  (counts 7, 10).

On January 16, 2004, Royer pled guilty to a two-count criminal information under a written plea agreement.  Count One of the criminal information charged that, in violation of 18 U.S.C. § 924(c), Royer:

> Did unlawfully and knowingly aid and abet the use and discharge of a semiautomatic pistol by Masoud Khan, Yong Kwon, Mohammad Aatique, and Khwaja Hasan in Pakistan during, in relation to, and in furtherance of . . . the conspiracy charged in Count One of the Indictment. . . .

---

[1]  Except as otherwise specified, the facts set forth in this "Background" section come directly from the section of the same name in this Court's Memorandum Opinion of February 12, 2012, denying Royer's motion for relief under 28 U.S.C. § 2255.

2

Count One of the superseding indictment - - to which Count One of the criminal information referred - - charged a conspiracy to commit offenses against the United States, including a) to prepare for and take part in military expeditions to be carried on from the United States against the territory of foreign states, districts, and peoples with whom the United States was at peace, in violation of the Neutrality Act, 18 U.S.C. § 960; and b) to enlist and engage with intent to serve in armed hostility against the United States, in violation of 18 U.S.C. § 2390.  In his Statement of Facts, Royer admitted participating in at least the conspiracy to prepare to attack India.  In short, Royer pled guilty - - at least - - to aiding and abetting the use of firearms by Kwon, Hasan, Aatique, and Khan in Pakistan, during and in relation to a conspiracy to prepare for and take part in a military expedition against India.[2]

In the Statement of Facts attached to his plea agreement, Royer admitted that he had been highly familiar with LET for many years before the indictment was filed and that he was instrumental in his co-conspirators' ability to get accepted into the LET camp.  Specifically, Royer admitted that in April 2000, he entered Pakistan with the intention of receiving training to fight in Chechnya. Instead of traveling to Chechnya, he remained in Pakistan to assist with LET's publicity efforts and, in that vein, created LET's online newsletter and Yahoo! group, which disseminated information about LET's activities, including descriptions of attacks on Indian soldiers and Indian government buildings. Before leaving Pakistan in May 2000, Royer also

---

[2] Count One of the criminal information carried a mandatory minimum sentence of ten years imprisonment.  Count Two of the criminal information alleged aiding and abetting the carrying of an explosive during the commission of a felony which may be prosecuted in a United States court, in violation of 18 U.S.C. §§ 844(h)(2).  That offense carried a mandatory term of incarceration of ten years, which had to run consecutive to the sentence on Count One.

3

visited LET training camps and went to the front line in Kashmir, where he shot at Indian positions with a machine gun.

Upon his return to the United States, Royer continued editing LET's electronic newsletter and began a new Yahoo! group supporting the organization. He also encouraged others to train with LET in Pakistan and described his experience firing at Indian positions. He began playing paintball with his eventual co-conspirators in 2000. During these paintball games, jihad was a frequent topic of conversation. Royer eventually contacted LET to secure a place at a training camp for Ibrahim Ahmed Al-Hamdi, who went on a mission with an LET group that fired rocket-propelled grenades and automatic weapons at Indian troops in Kashmir.

The following year, while in Saudi Arabia on Hajj, Royer introduced his companions, including Kwon, to an LET leader for the purpose of providing them information about the LET. Royer also purchased "videotapes featuring footage of jihad in a variety of places," including Kashmir, and later showed these videos to members of his paintball group. As he had for Al-Hamdi, Royer contacted LET on behalf of Aatique and Seifullah Chapman, so that these men could also gain access to the training camp. Both men soon thereafter went to Pakistan, trained with LET, and described their experiences to Royer upon their return.

During a group dinner at Kwon's house a few days after the September 11, 2001 attacks, a guest expressed concern about a backlash against Muslims and encouraged the attendees to "be with the mujahideen," a term referring to "those who are engaged in a physical fight in support of their religion." Royer announced that he could help interested persons gain entry into an LET camp to get the training they would need to become mujahideen.

Three days later, Khan left for Pakistan where he obtained training from LET. Additionally, Royer met Kwon and Hasan at a 7-11 store in Virginia, purchased a telephone card, and called an LET representative to give that individual physical descriptions of Kwon and Hasan, who departed on September 20, 2011 for Pakistan with Royer's instructions as to how to find LET there. Meanwhile, Royer was encouraging other members of the paintball group to go to LET as well.[3]

On September 28, 2001, the FBI contacted one of Royer's former attorneys to inquire whether Royer would speak with the FBI.  Instead of speaking with agents, Royer, who had already been planning to go to Pakistan, decided to depart immediately and left on October 1, 2001.  Because he had no time to obtain a Pakistani visa, he booked a flight to Bosnia as an intermediate stop, which is where his wife and children joined him one week later.  Once in Bosnia, Royer was unable to obtain a Pakistani visa, but via email, he continued to encourage members of the paintball group to go to LET.  He also posted a message to one of his electronic lists praising John Walker-Lindh, known as the "American Taliban," following Walker-Lindh's capture in Afghanistan.

Meanwhile, Kwon, Hasan, and Khan, who had gotten into an LET camp through Royer's assistance, were receiving training in firing weapons, including a machine gun and a rocket-propelled grenade.

---

[3]  For example, Royer contacted Nabil Gharbieh shortly after the dinner at Kwon's house to relay to him Timimi's counsel that they should go to a jihad camp to prepare to go and fight, or at least leave the United States.  *U.S. v. Khan, et al*, Trial Transcript, February 10, 2004, at p. 472.

In April 2002, Royer returned to the United States.  In March 2003, law enforcement executed a search warrant of his home and seized a copy of a United States Department of the Army field manual entitled "Guerrilla Warfare and Special Forces Operations," a contact number for LET, and one-minute movies produced by a Russian firearms manufacturer depicting usage of AK-47-style rifles with silencers and grenade launchers.

Based on those facts and Royer's representations during the plea colloquy, the Court accepted his guilty plea.  On April 9, 2004, Royer was sentenced to 20 years imprisonment, consisting of 120 months on Count One and 120 months on Count Two, to be served consecutively, as well as three years of supervised release on each count.  He did not appeal his conviction or sentence, which became final on April 9, 2004.

Royer agreed in his plea agreement to cooperate, and testified in the grand jury about the dinner at Kwon's house after the 9/11 attacks.  On June 22, 2004, Royer described the September 16, 2001, meeting at Kwon's house as one in which Timimi clearly encouraged those assembled there to fight against Americans in Afghanistan - - and one at which Royer himself agreed to help the others get training from LET so that they could do just that:

> Q:    So, on the basis of what he told you what did you understand Timimi to be advising you and the others gathered at Kwon's house to do?

> A:    Well, I understood him to be, to be, you know, implying that, you know, in pretty clear terms that, that it would be beneficial for us to go and help them - help the Taliban.

> Q:    What discussion was there in Timimi's presence about fighting in Afghanistan?

> A:    The only discussion is - that I recall is I - because he, he sort of - you know, he, he, he danced around the, the issue and he never actually said go join the Taliban, you know.  But I think that this - I mean, I know that this was the message that all of us received, based on my own understanding and based on comments - a

6

comment I heard afterwards.  And so I specifically said well, I wouldn't go and join the Taliban or al-Qaeda because, you know, I would be basically shot as a spy coming from America.  And I said that because that's true, I wouldn't do that, and I also wanted to sort of put out my disagreement with, with what I thought was being said.  At the same time I didn't, you know, I didn't  you know, unfortunately, I didn't come out and clearly say that's not what any of us should be about and, you know, this is wrong.  But that's how I stated my, my views.

Q:     What discussion was there about whether training was needed to fight with the mujahedin?

A.     Well, what I said was that if anyone wanted to, to join mujaheedin then they should get training first, and if they wanted to do so they, they could obtain it from Lashkar-e-Taiba, an organization based in Kashmir with whom I had contact.

Q:     What did Timimi say about whether - at that meeting about whether Lashkar-e-Taiba was an appropriate place to obtain training?

A:     He said it was a good, good group of people and that they were on the right path.[4]

In essence, Royer admitted that he offered to assist the others obtain training from LET so that they could follow Timimi's advice to fight against Americans in Afghanistan.  In such circumstances, Royer's offer demonstrates his involvement in a conspiracy to aid in the war against the United States, as well as to support the Taliban, LET, and al-Qaeda

Khan and three co-defendants were tried in a bench trial that began on February 9, 2004, and included testimony from Kwon, Aatique, and Hasan.  On March 4, 2004, the Court found Khan guilty of eight counts of the indictment, Chapman guilty of five, and Hammad guilty of three counts of the indictment.  It dismissed all charges against Caliph.

---

[4] This grand jury transcript was authorized for disclosure and introduced as Government Exhibit 9D4 in *United States v. Benkahla*, Crim. No. 1:06cr9.

In 2005, Timimi was tried and convicted for a variety of offenses related to his actions shortly after September 11, 2001, including inducing the attendees at the dinner at Kwon's house on September 16, 2001, to support the Taliban and levy war against the United States, in violation of 18 U.S.C. §§ 373 and 2384, and 50 U.S.C. § 1705.

In March 2009, Royer filed a motion to vacate his sentence under 28 U.S.C. § 2255. That motion was denied on February 15, 2012, on the grounds that it was untimely. The Court held, however, that the motion would fail even if it was not untimely, because Royer was unable to establish his actual innocence of the offense to which he pled guilty, or of the charges that were dropped in consideration for his guilty plea.

In June 2014, Royer filed a motion to vacate his sentence under 28 U.S.C. § 2241. On that occasion, he argued that the 924(c) charge to which he pled guilty was invalid because the Fourth Circuit had recently narrowed its interpretation of "crimes of violence" that may predicate convictions under Section 924(c). This Court rejected Royer's Section 2241 motion in November 2014, and again on reconsideration in January 2015. This Court concluded that the relevant law had not changed after Royer's Section 2255 motion was filed. Moreover, the Court also concluded that Royer could not be entitled to relief because he was unable to show actual innocence of charges against him that were dropped as part of his guilty plea agreement.

This year, Royer filed a new motion to vacate his sentence under 28 U.S.C. § 2241, and again challenges his conviction on the Section 924(c) count of his criminal information. This time, he alleges that the conviction must be reversed because, in light of the Supreme Court's decision in *Johnson v. United States*, 135 S.Ct. 2551 (2015), the charge to which he pled guilty

has been determined to be unconstitutionally vague.   His latest argument has no more merit than his previous ones.

Argument

Royer's arguments are unavailing for a variety of reasons.  Notwithstanding the lack of jurisdiction to consider his argument in the first place, *Johnson* does not apply to the count of Royer's conviction.  Even if it did, however, it would not matter.  This is so because - - as this Court has already found twice - - his guilty plea foreclosed collateral review of the convictions he admitted as part of a plea bargain in the course of which the government dropped other serious charges of which he was not innocent.

Consideration of the jurisdictional issues raised by Royer's petition is likely moot because this Court already found that Royer's guilty plea foreclosed collateral review of the convictions he admitted as part of a plea bargain in the course of which the government dropped other serious charges of which he was not innocent.  While the government typically raises jurisdictional arguments first, we raise them here last because the most straightforward way of resolving the instant petition is likely to assume without deciding that the Court has jurisdiction over the petition, and then deny it for failure to establish actual innocence.

I.      Royer Is Not Actually Innocent of Other More Serious Charges
        That the Government Dismissed in Exchange for His Guilty Plea

Despite Royer's argument, this Court need not consider whether Section 924(c) is unconstitutionally vague based on *Johnson v. United States*.  After all, Royer pled guilty to a violation of Section 924(c) in Count 1 of his Criminal Information in exchange for the government's agreement to drop crimes that were at least as serious as the 924(c) charge that was

9

the basis of that count.  As a result, to obtain relief now, Royer would have to show that he was actually innocent of those dropped charges as well - - but that he cannot do.

As this Court wrote in its Memorandum Opinion of February 15, 2012, denying Royer's Section 2255 motion, "on collateral review, claims that were not raised on appeal are deemed waived, and procedural default operates to bar such claims, unless the movant can establish cause and prejudice or, in the alternative, actual innocence."  Memorandum Op., at 11.  The Court further explained that the showing of actual innocence had to reach not only the charge to which Royer pled guilty, but also the charges that were dropped as part of his plea bargain:

> Actual innocence means factual innocence, not merely the legal insufficiency of a conviction or sentence*, and where the Government has foregone more serious charges in the interest of a plea bargain, the movant must show actual innocence with respect to those charges as well*. *See Bousley v. United States*, 523 U.S. 614, 623-24 (1998); *United States v. Mikalajunas*, 186 F.3d 490, 494 (4th Cir. 1999).

*Id*. at 12 (emphasis added).

"The logic of the *Bousley* opinion does not require that the charge that was dropped or forgone in the plea negotiations be more serious than the charge to which the petitioner pleaded guilty.  It is enough that it is as serious." *Lewis v. Peterson*, 329 F.3d 934, 936-37 (7th Cir. 2003).  Accordingly, to avoid a miscarriage of justice, a petitioner must establish his actual innocence not only as to forgone charges that are more serious than the challenged charge, but also as to forgone charges that are *as* serious as the challenged charge. *United States v. Caso*, 723 F.3d 215, 222 (D.C. Cir. 2013) ("the likely rationale for the *Bousley* rule supports requiring petitioners to show their innocence of equally serious charges").

10

This rule takes into account the probability that the government would not have dropped good counts in plea negotiations if it had known that the remaining count was invalid, combined with the probability that the defendant likely would not have escaped punishment if the good counts had not been dismissed.  If the good counts were as serious as the invalid count, then the defendant would have incurred at least as heavy as a punishment if the government had gone forward on the good counts as he did by pleading to the charge later determined to be invalid. *Id.*

It is obviously true that several of the charges that ultimately were dropped as part of the plea bargain involved Section 924(c) and, therefore, could be subject to the same vagueness challenge based on *Johnson* that Royer brings with respect to Count 1 of the Criminal Information.  Nevertheless, other charges that were dropped in exchange for his guilty plea were at least as serious as the offense to which he pled guilty but did *not* involve Section 924(c).  After all, in in Count 2, Royer was charged with conspiring to levy war against the United States; in Counts 3 and 5 he was charged with conspiracy to contribute material support to al Qaeda and LET, respectively; and in Count 4, he was charged with conspiracy to provide support to the Taliban.  Each of those charges was at least as serious as the count in the Criminal Information to which Royer pled guilty, but all of them were dismissed as part of his plea agreement.

To determine whether a dismissed charge is as or more serious than a charge to which a defendant pled guilty – and thus whether the defendant must establish actual innocence as to both charges – courts compare the two charges under the United States Sentencing Guidelines. *Caso*, 723 F.3d at, 223 ("the appropriate measure of the seriousness of an offense must be derived from the Sentencing Guidelines rather than the statutory maximum penalty").  *Accord*

11

*United States v. Halter*, 217 F.3d 551, 553 (8th Cir. 2000); *United States v. Lloyd*, 188 F.3d 184,

189 n.13 (3d Cir. 1999).

Here, the charge to which Royer pled guilty carried a mandatory minimum of ten years'

incarceration, 18 U.S.C. § 924(c)(1)(A)(iii), and the 2003 Guidelines under which Royer was

sentenced recommended a sentence equal to the mandatory minimum for such an offense.

*United States Sentencing Guidelines* ("U.S.S.G.") § 2K2.4(b) (2003).  In exchange for Royer's

plea of guilty, the Government dismissed all of the counts in the Superseding Indictment.  As

explained below, the bottom of the Guidelines ranges for Counts 2, 3, 4, and 5 all far exceeded

ten years, but Royer cannot demonstrate that he was actually innocent of any of those charges.

For example, Count 5 charged Royer with a conspiracy to provide material support and

resources to LET in carrying out a violation of 18 U.S.C. § 956 (conspiracy to kill or injure

persons or damage property in a foreign country), in violation of 18 U.S.C. § 2339A.  Under the

2003 Guidelines, the offense level for a § 2339A conspiracy was the offense level for the

underlying substantive offense.  U.S.S.G. § 2X1.1(a) (2003).  Here, the underlying offense,

§ 956, fell under U.S.S.G § 2A1.5, conspiracy or solicitation to commit murder, which carried a

base offense level of 28.  U.S.S.G. § 2A1.5 (2003).

As this Court explained, the § 2339A conspiracy charged in Count 5 involved crimes of

violence and damage to property in India, including attacks on troops and civilian targets.  *Khan*,

309 F. Supp. 2d at 822.  Such activity was "calculated to influence or affect the conduct of

government by intimidation or coercion, or to retaliate against government conduct" and

therefore constitutes "terrorism." 18 U.S.C. § 2332b(g)(5).  Accordingly, Royer's base offense

level of 28 would have received an additional twelve-point increase under U.S.S.G § 3A1.4,

12

resulting in a final offense level of 40  - -  and his criminal history category would have been increased to Level VI.[5]  Accordingly, the Guidelines range would have been 360 to life - - making Count 5 of the Superseding Indictment more "serious" than Count 1 of the information for purposes of determining "actual innocence."

The guidelines analysis is identical for the conspiracy to provide material support to al-Qaeda that was charged in the Count 3 of the Superseding Indictment and dismissed pursuant to Royer's plea agreement.  Moreover, it is substantially the same for the conspiracy to levy war against the United States that was charged in Count 2 of the Superseding Indictment but dismissed pursuant to the plea agreement, and for the conspiracy to provide support to the Taliban that was charged in Count 4 but dismissed pursuant to the plea agreement.[6]  For purposes of determining "actual innocence," therefore, Counts 2, 3, 4, and Count 5 of the Superseding Indictment were each more "serious" than the count to which Royer pled guilty but now challenges.

In February 2012, this Court considered Royer's claims of actual innocence, and concluded that "there is no reasonable likelihood that Royer would have been acquitted of any count in the superseding indictment."  Memorandum Op. at 24.  This Court wrote:

> On this record, including the admissions Royer made under oath during his plea colloquy and in grand jury testimony, ***there is no reasonable***

---

[5]  That very calculation was made in connection with the sentencing by this Court of Royer's co-defendants Chapman and Khan, after they were convicted of conspiring to provide material support to LET.

[6]  Masaud Khan  was convicted of those same offenses, and the final offense levels calculated in his case for each of those counts was 38, based on base offense levels of 26 from U.S.S.G § 2M5.3, plus 12 levels for the terrorism enhancement under U.S.S.G § 3A1.4.

> ***likelihood that Royer would have been acquitted of any count in the
> superseding indictment.*** As a result of such convictions, he would have
> been sentenced to far more time in prison than he received. Therefore, he
> does not prevail on this issue.

*Id*. (emphasis added).  That finding remains dispositive today.[7]

The fact that Counts 2, 3, 4, and 5 were at least as serious as Count 1 of the Criminal
Information, but dropped as part of the plea bargain, bars Royer from attacking Count 1 of that
Criminal Information without showing actual innocence also on Counts 2, 3, 4, and 5.  In light of
this Court's holding from February 2012 that "there is no reasonable likelihood that Royer would
have been acquitted of any count in the superseding indictment," Memorandum Op. at 24,
however, Royer cannot establish actual innocence with respect to the serious charges that were
dismissed as part of his plea agreement.  As a result, he is entitled to no relief now regardless of
whether Section 924(c)(3) is unconstitutionally vague.

II.     *Johnson*'s Holding Does Not Extend To § 924(c)(3)(B)

In pertinent part, 18 U.S.C. § 924(c)(1)(A) provides for a mandatory consecutive term of
imprisonment upon "any person who, during and in relation to any ***crime of violence*** . . . , uses
or carries a firearm" (emphasis added).   Pursuant to 18 U.S.C. § 924(c)(3)(B), a "crime of
violence"  is any felony offense that "by its nature, involves a substantial risk that physical force
against the person or property of another may be used in the course of committing the offense."

Royer's guilty plea to a violation of Section 924(c)(1)(A) properly was predicated on the
use of a firearm during and in relation to a violation of the Neutrality Act, codified at 18 U.S.C.
§ 960.  Violation of the Neutrality Act properly is a felony offense "that by its nature, involves a

---

[7]  The record before the Court also includes the evidence presented at the Timimi trial.

14

substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Royer's petition fails on the merits because the "residual clause" definition of "crime of violence" in Section 924(c)(3)(B) is *not* "parallel" to the "residual clause" definition of that term in Section 924(e)(2)(B)(ii) (the ACCA), which *Johnson* declared to be unconstitutionally vague. The two provisions differ in their language, structure, and interpretive precedents.  As discussed below, Section 924(c)(3)(B) does not have the combined set of factors that coalesced in *Johnson* to persuade the Court that the residual clause in the ACCAwas unconstitutionally vague.

A.      The Supreme Court's Decision in *Johnson*

The Armed Career Criminal Act ("ACCA") provides for a mandatory minimum sentence of 15 years if a defendant violates 18 U.S.C. § 922(g) and has at least three prior convictions for either a "serious drug offense" or a "violent felony."  18 U.S.C. § 924(e)(1).  The ACCA defines the prior crimes of conviction that qualify as a "violent felony" as any crime that:

i.      has as an element the use, or attempted use, or threatened use of physical force against the person of another; or

ii.     is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).  The second category of prior crimes that qualify as a "violent felony" may be referenced as a "residual" clause, because it encompasses any crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii).

In *Johnson*, the Supreme Court held that the "residual" clause portion of Section 924(e)(2)(B)(ii), that defines a "violent felony" to include an offense that "is burglary, arson, or

15

extortion, involves use of explosives, or otherwise involves conduct that presents a serious

potential risk of physical injury to another," violates the Due Process Clause because it is

impermissibly vague on its face. *Johnson*, 135 S. Ct. at 2563. In *Johnson,* the Supreme Court

overruled its earlier decisions in *James* v. *United States*, 550 U.S. 192 (2007), and *Sykes* v.

*United States*, 564 U.S. 1 (2011), which had previously rejected the contention by dissenting

justices that the residual clause was vague. *Johnson*, 135 S. Ct. at 2563.

> B.      Royer's Guilty Plea Was Based on a Statute
>         Materially Different from the One Considered in *Johnson*

While the definition of a "crime of violence" in Section 924(c)(3)(B) has similarities to

the definition of a "violent felony" in the ACCA, the two sections differ in important ways. For

ease of reference, they are here set forth next to each other:

| A "crime of violence" under § 924(c)(3)(B) is any felony offense that | A "violent felony" under § 924(e)(2)(B)(ii) is any felony crime that |
|---|---|
| | "is burglary, arson, or extortion, involves use of explosives, or |
| "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" | otherwise involves conduct that presents a serious potential risk of physical injury to another" |

In *Johnson*, the Supreme Court reasoned that several factors in the ACCA's "residual"

clause combined to render the provision vague, while recognizing that "[e]ach of the

uncertainties in the residual clause may be tolerable in isolation." 135 S. Ct. at 2560. The key

factors in the ACCA identified in *Johnson*, however, are absent from 18 U.S.C. 924(c)(3)(B).

1.      <u>The Enumerated Offenses In ACCA Are Absent</u>.

First, Section 924(c)(3)(B) does not have the structure of Section 924(e)(2)(B)(ii), which contains a list of enumerated crimes and an "otherwise" provision that introduces a residual clause. *Johnson* found that the differences among the enumerated crimes and lack of clarity on the degree of risk each posed magnified the vagueness concerns in assessing levels of risk under the residual clause. 135 S. Ct. at 2557-58.

The enumerated list in Section 924(e)(2)(B)(ii) had troubled members of the Court since *James*. *See*, *e.g.*, *James*, 550 U.S. at 215-16, 230 n.7 (Scalia, J., joined by Stevens and Ginsburg, J.J., dissenting) (stating that comparing a predicate offense with its closest analog among enumerated offenses is an unhelpful test if the analog is not obvious, because the listed offenses have little in common). The Supreme Court also struggled with the enumerated list in *Begay v. United States*, where even the majority was concerned that "the examples are . . . far from clear with respect to the degree of risk each poses." 553 U.S. 137, 143 (2008).

The continuing confusion over how to interpret the list in conjunction with the residual clause ultimately convinced the *Johnson* Court of ACCA's vagueness. Indeed, the interpretive difficulties posed by the list of enumerated crimes pervaded the Court's analysis. For example, the Court attributed part of the "uncertainty about how much risk it takes for a crime to qualify" to the residual clause's structure, which "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes - -  burglary, arson, extortion, and crimes involving the use of explosives"  - -  even though the degree of risk posed by those four enumerated crimes is "far from clear." *Johnson*, 135 S. Ct. at 2558.

17

The Court again referred to the enumerated crimes in explaining why its decisions in *Begay* and *Sykes* did "not succeed in bringing clarity to the meaning of the residual clause." *Id.* at 2559 (*Begay*'s test, which turned on similarity of crime to the enumerated offenses, failed because "the enumerated crimes are not much more similar to one another in kind than in degree of risk posed"); *id.* ("common sense" used in *Sykes* was not reliable criterion because "[c]ommon sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes"). And, critically, the Court distinguished other statutes requiring risk-based assessments in part because they do *not* "link[] a phrase such as 'substantial risk' to a confusing list of examples." *Id.* at 2561. Section 924(c)(3)(B), like the statutes the Court distinguished in *Johnson*, contains no "confusing list" to cloud its analysis.

In short, the presence of the enumerated list of offenses in the ACCA was a determinative factor in *Johnson*. *Johnson* found that the differences among the enumerated crimes and lack of clarity on the degree of risk each posed magnified the vagueness concerns in assessing levels of risk under the residual clause in Section 924(e)(2)(B)(ii). 135 S. Ct. at 2557-58. In contrast, Section 924(c)(3)(B) makes no reference to any enumerated crimes. Accordingly, a court considering whether a particular offense is covered by Section 924(c)(3)(B) is not required to evaluate the risk of particular conduct in light of any enumerated crimes.

2.    Section 924(c)(3)(B) Is Materially Narrower Than the ACCA

Another uncertainty about the ACCA that the Supreme Court identified in *Johnson* - - but that is absent from § 924(c)(3)(B) - - is the necessity for courts to go "beyond evaluating the chances that the physical acts that make up the crime injure someone" and to evaluate the risk for injury even "after" completion of the offense. *Id.* at 2557; *see also id.* at 2559 (noting that

"remote" physical injury could qualify under ACCA, but that the clause does not indicate "how remote is too remote").  After all, the ACCA purported to encompass any felony offense that "involves conduct that presents a serious potential risk of physical injury to another" *regardless* of whether the physical injury is necessarily caused by the underlying crime.  The Supreme Court explained that the analysis required by the ACCA into whether a crime "involves conduct" that presents too much risk of injury goes beyond the offense elements.  *Id.* at 2557.

"The inclusion of burglary and extortion among the enumerated offenses," the Supreme Court further explained, confirmed that courts assessing risk had to go "beyond evaluating the chances that the physical acts that make up the crime will injure someone." *Id.*  That was so because a risk of injury could arise in a burglary *after* the breaking and entering had occurred, and an extortionist might become violent *after* making his demand.  *Id.*  The consideration of post-offense conduct was therefore part of the indeterminate "wide-ranging inquiry" necessitated by the ACCA.  *Id.*

In contrast, Section 924(c)(3) addresses that issue by requiring that force must be used "in the course of committing the offense." *Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004) (interpreting the identical language in 18 U.S.C. § 16).  This means that the assessment is confined to the risks that arise during the commission of the offense.  *See id.* at 7 (to determine whether an offense is a crime of violence, a court must "look to the elements and the nature of the offense of conviction).

Under *Leocal*, an aggravated felony for purposes of § 16(b) - - and, by extension, a "crime of violence" for purposes of § 924(c)(3)(B) - -  is limited to "offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another

19

in committing an offense." *Leocal*, 543 U.S. at 10.   In *Leocal*, the Supreme Court specified that § 16(b) includes only "violent, active" crimes.   *Id.* at 11.   To qualify as a predicate offense under this framework, the offense must proscribe conduct that (1) naturally involves a disregard of a substantial risk of force against another, and (2) the risk of force must arise during the course of committing (3) an active, violent offense.   *Id.* at 10-11.[8] The risk of force during commission of the offense significantly narrows § 16(b) (and, by extension, Section 924(c)(3)(B)).

Under § 924(c)(3)(B) (and § 16(b)), the ordinary case is defined by the elements of the offense, and a court does not, as in ACCA, consider risks that arise only after the physical acts constituting the crime have been completed.   The court asks whether the offense elements would "naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Leocal*, 543 U.S. at 11.   The analysis is non-speculative and is consistent with *Johnson*.   If the risk of the use of force is naturally present in the elements of the offense, it qualifies as a crime of violence under § 924(c)(3)(B) (or § 16(b)). This alleviates the concern that *Johnson* had about the far ranging inquiry into conduct going beyond the offense elements required by the ACCA.

Indeed, in *Leocal*, the Supreme Court contrasted the wider scope of USSG § 4B1.2  - - which is essentially identical to that of the ACCA  - -  with the narrower scope of § 16(b) - - which is essentially identical to Section 924(c)(3)(B):

> The reckless disregard in § 16 relates not to the general conduct or to the possibility that harm will result from a person's conduct, but to the risk

---

[8]  In fact, the federal public defender's brief in *Johnson* agreed that "[t]hese requirements are meaningfully different than the ACCA's residual clause and make § 16(b) narrower."  *See* Supp. Reply Br. for the Petitioner, *Johnson* v. *United States*, 2015 WL 1641122, at *15.

that the use of physical force against another might be required in committing a crime. . . .  The "substantial risk" in § 16(b) relates to the use of force, not to the possible effect of a person's conduct.  ***Compare § 16(b) (requiring a "substantial risk that physical force against the person or property of another may be used") with United States Sentencing Commission, Guidelines Manual § 4B1.2(a)(2) (Nov.2003) (in the context of a career-offender sentencing enhancement, defining "crime of violence" as meaning, inter alia, "conduct that presents a serious potential risk of physical injury to another."***)

*Leocal*, 543 U.S. at 10 & n. 7 (emphasis added).  *See United States* v. *Serafin*, 562 F.3d 1105, 1109  (10th Cir. 2009)[9]  ("the Supreme Court has found that the definition of a crime of violence under § 16(b) [that is essentially identical to Section 924(c)(3)(B)] is narrower than that in USSG § 4B1.2 [that is essentially identical to that of the ACCA]").

In short, the textual difference recognized by the Supreme Court in *Leocal* between Section 16(b) - - that is identical to Section 924(c)(3)(B) - - and the Guideline provision that is identical to the ACCA undercuts Royer's argument.  After all, for an offense to qualify as a Section 16(b) crime of violence, the risk of force must arise in the course of committing the crime and not merely as a possible result. The provision's focus on the use of force during an offense, rather than on the potential risk and effects of the offense, limits its reach and avoids the kind of speculation about extra-offense conduct that *Johnson* denounced.  *Johnson,* 135 S. Ct. at 2557, 2559.  Accordingly - - and unlike the ACCA  - - Section 924(c)(3)(B) does not go beyond "the physical acts that make up the crime." *Johnson*, 135 S. Ct. 2557.

---

[9]  Although the comparison was actually made between 18 U.S.C. § 16 and Section 4B1.2 of the Sentencing Guidelines, the court noted that the language of the former is essentially identical to that of Section 924(c)(3)(B), and the language of the latter is essentially identical to that of Section 924(e)(2)(B).  *Serafin*, 562 F.3d at 1108-09.

21

### 3.   The Court Has Not "Repeatedly" Failed To Construe § 924(c)(3)(B)

In *Johnson*, the Supreme Court stressed that its conclusion that the ACCA was unconstitutionally vague was based on the unsuccessful nature of its repeated attempts to craft a "principled and objective standard" for that statute.  *Johnson,* 135 S. Ct. at 2558-60.  Indeed, *Johnson* was the Supreme Court's "fifth [case] about the meaning of the [ACCA] residual clause."  *Id.* at 2559.  *See Sykes*, 131 S. Ct. at 2287 (Scalia, J., dissenting) (stating that the Court's repeated failure in addressing ACCA is "[w]hat sets ACCA apart" and "confirms" its vagueness).  *Johnson* expressed the Supreme Court's clear frustration that its attempts to delineate the reach of Section 924(e)(2)(B) had been a "failed enterprise."  *Johnson*, 135 S. Ct. at 2560.  The same is simply not true with respect to Section 924(c)(3)(B).

Section  924(c)(3)(B) has not generated any comparable confusion in either Supreme Court or lower court cases.  Unlike Section 924(e)(2)(B), the Supreme Court has rendered only one significant decision regarding Section 924(c)(3)(B) or its cognate, 18 U.S.C. §16.  That decision occurred over ten years ago and caused no controversy among the justices.  *Leocal*, 543 U.S. at 1.  In *Leocal,* a unanimous Court expressed no uncertainty and had no difficulty in adopting an interpretive framework that identified one offense (burglary) as the "classic example" of a Section 16(b) qualifying offense, and another (DUI) that was not.  *Leocal*, 543 U.S. at 10.  The Supreme Court's analysis (which was joined by Justice Scalia, the author of *Johnson* and the principal critic of ACCA's vagueness leading up to *Johnson*) belies a claim that Section 924(c)(3)(B) is too uncertain to be readily applied and to permit evenhanded application.

22

4. The Court Intended that *Johnson* Be Limited to Section 924(e)(2)(B)

*Johnson* explicitly noted that its decision "does not call into question . . . the remainder of the Act's definition of a violent felony." 135 S. Ct. at 2563. Moreover, in *Johnson*, the Supreme Court expressly noted that striking ACCA's residual clause would have little effect on other risk-based statutes. *Johnson*, 135 S. Ct. at 2561.

Yet, the language of Section 924(c)(3)(B) is identical to many other federal statutes. *See*, *e.g.*, 18 U.S.C. § 16(b); 18 U.S.C. § 3142(f)(1)(A) and (g)(1) (bail statute); 18 U.S.C. § 521(d)(3)(C) (enhanced sentence for criminal gang members); 18 U.S.C. § 3663A(c)(1)(A) (mandatory restitution); 18 U.S.C. § 5032 (juvenile transfer statute). In light of the Supreme Court's language in *Johnson,* there is no basis to conclude that such decision requires the striking down of Section 924(c)(3) as unconstitutionally vague.

5. Royer May Not Make a Facial Challenge to Section 924(c)(3)(B)

Outside of the First Amendment context, a person whose conduct is clearly proscribed by a statute cannot complain that the law is vague as applied to the conduct of others. While *Johnson* held that a statute may be facially vague even though "some conduct clearly falls within the provision's grasp," 135 S. Ct. at 2561, it did not hold that any possibility of a vague application requires finding a statute void for vagueness. Rather, it concluded that the residual clause was void for vagueness because of its inherent inability to produce "evenhanded, predictable, or consistent" applications." *Id*. at 2563. The provision was, the Court found, "a judicial morass that defies systemic solution, a black hole of confusion and uncertainty that frustrates any effort to import some sense of order and direction." *Id*. at 2562 (internal quotation marks omitted).

23

But "there are statutes that by their terms or as authoritatively construed apply without question to certain activities, but whose application to other behavior is uncertain." *Smith v. Goguen*, 415 U.S. 566, 577-78 (1974). For those statutes, the general rule is that a vagueness challenge is not available to one who violates the "hard core" of the statute. *Id*. Facial vagueness challenges should therefore be reserved for a statute that "simply has no core," "in the sense that no standard of conduct is specified at all." *Id*. That is not the case with respect to Section 924(c)(3), where the Supreme Court has already identified offenses that clearly fall within the identical provision at 18 U.S.C. § 16. *See Leocal*, 543 U.S. at 10 (burglary).

Unlike with respect to the ACCA's residual clause, there clearly is a "core conduct'" covered by § 924(c)(3). For example, in *Leocal*, the Supreme Court described burglary as a "classic example" of a crime that satisfies the statutory language [of the identical 18 U.S.C. § 16] "*not* because the offense can be committed in a generally reckless way or because someone may be injured, but because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime." *Id*. (emphasis in original). Accordingly, Section 924(c)(3) is constitutional both on its face and, for the reasons stated above, as applied to Royer's conviction.

Acts of Congress enjoy a strong presumption of validity. *United States* v. *National Dairy Products Corp.*, 372 U.S. 29, 32 (1963). A court's duty is to construe, rather than to condemn, a statute. *See Skilling* v. *United States*, 561 U.S. 358, 403 (2010). In *Johnson*, the Supreme Court was convinced by "[n]ine years' experience," and by multiple prior decisions, that the ACCA's residual clause was not susceptible to principled construction. *Johnson*, 135 S. Ct. at 2560. Here, however, Section 924(c)(3)(B) does not possess the "'sum'" of factors that led the *Johnson*

Court to its conclusion. *Id.* Accordingly, there is no reason for this Court to construe the definition of "crime of violence" in 18 U.S.C. § 924(c)(3)(B)) as unconstitutionally vague.

III.   <u>Jurisdiction</u>

The primary means to collaterally attack a federal conviction and sentence is through a motion pursuant to 28 U.S.C. § 2255. Section 2255 provides that a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Section 2255(e) states:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

Section 2255 "was intended to replace § 2241 in the vast majority of cases" for federal prisoners. *San-Miguel v. Dove*, 291 F.3d 257, 260-61 (4th Cir. 2002). By its very terms, the sole exception to the exclusivity of the Section 2255 remedy is where that remedy is "inadequate or ineffective to test the legality of [the federal prisoner's] detention." 28 U.S.C. § 2255(e). *See San-Miguel*, 291 F.3d at 261 ("petitioners are prevented from filing a § 2241 petition unless they fall within the savings clause of § 2255"). This exception, known as Section 2255's "savings clause," is the only portal through which a federal prisoner may challenge the legality of his detention outside of Section 2255, and it permits federal prisoners to file habeas petitions under Section 2241 only under very limited circumstances.

A prisoner "may file a habeas petition under § 2241 only if the collateral relief typically available under § 2255 'is inadequate or ineffective to test the legality of his detention.'" *Prousalis v. Moore*, 751 F.3d 272, 275 (4th Cir. 2014) (quoting 28 U.S.C. § 2255(e)).  If a federal prisoner brings a § 2241 petition that does not fall within the scope of this "savings clause," then the district court must dismiss the "unauthorized habeas motion . . . for lack of jurisdiction."  *United States v. Surratt,* ___ F.3d ___, 2015 WL 4591677 (4th Cir. July 31, 2015), slip op. at 10.

Royer attempts to invoke the "savings" clause of Section 2255 to establish jurisdiction in this Court.  To invoke the savings clause and proceed under Section 2241, however, he bears the burden of showing that a motion under Section 2255 is inadequate or ineffective to test the legality of his detention.  *Charles v. Chandler*, 180 F.3d 753, 756 (6th Cir. 1999).  Yet, "[i]t is beyond question that § 2255 is not inadequate or ineffective merely because an individual is unable to obtain relief under that provision."  *In re Jones*, 226 F.3d 328, 333 (4th Cir. 2000).  Nor is a § 2255 motion inadequate or ineffective because a person may be procedurally barred from filing it.  *In re Vial*, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997).

It is well established that Section 2255 is inadequate or ineffective to test the legality of Royer's detention only if the following three criteria are established:

> (1) at the time of conviction, settled law of the Fourth Circuit or the Supreme Court established the legality of the conviction;

> (2) subsequent to Royer's direct appeal and the disposition of his first § 2255 motion, the substantive law changed such that the conduct of which he was convicted is deemed not to be criminal; and

26

> (3) Royer cannot satisfy the gatekeeping provisions of § 2255 because the new rule is not one of constitutional law.

*In re Jones*, 226 F.3d at 333-34.  Royer cannot meet the first two criteria set forth above.

At the time of Royer's guilty plea in 2004, even the question of whether the ACCA was unconstitutionally vague was hardly settled law.  After all, in striking the "residual clause" in 18 U.S.C. § 924(e)(3) earlier this year, the Supreme Court overruled its decisions to the contrary in *James v. United States*, 550 U.S. 192 (2007), and *Sykes v. United States*, 564 U.S.1 (2011). *Johnson*, 135 S. Ct. at 2561.  As a result, the constitutionality of Section 924(e)(3) was *not* settled when Royer pled guilty to a violation of Section 924(c)(2) in 2004, three years before *James* (and seven years before *Sykes*); the Supreme Court had not addressed vagueness in the context of the ACCA prior to that date, and therefore a defendant sentenced before the date of the *James* decision cannot establish cause for his procedural default.  Indeed, as the Fourth Circuit recently wrote, "[t]he § 2255 remedial vehicle was fully available and amply sufficient to test the argument, whether or not [the petitioner] thought to raise it."  *Surratt*, 2015 WL 4591677,  slip. op. at 25.

Moreover – and regardless of whether the law was settled when Royer pled guilty in 2004 - - Section 2241 cannot be available for Royer now because the substantive law did not change subsequent to his conviction such that the conduct of which he was convicted is deemed not to be criminal.  As described above, *Johnson* changed the law with respect to the ACCA and 18 U.S.C. § 924(e)(2)(B)(ii), but Royer's conviction was based on a violation of 18 U.S.C. 924(c)(3)(B), which was not affected by *Johnson.*  In short, even though, pursuant to *Johnson*, the

substantive law changed in 2015 with respect to the ACCA, it did not change for the violation underlying Royer's conviction.

Plea agreements work "only if dispositions by guilty plea are accorded a great measure of finality." *Blackledge v. Allison*, 431 U.S. 63, 71 (1977).  Thus, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, [usually] may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508 (1984).  This rule holds even when the law later changes in the petitioner's favor, as "the possibility of a favorable change in the law occurring after a plea is one of the normal risks that accompanies a guilty plea." *United States v. Archie*, 771 F.3d 217, 222 (4th Cir. 2014).

A guilty plea is more than a mere confession; a defendant who pleads guilty admits not only that he committed the acts described in the indictment but also that he is guilty of the substantive offense.  *United States v. Broce*, 488 U.S. 563, 570 (1989).  Having already admitted guilt of the substantive crime and affirmed as true the underlying facts of the conviction, a defendant can no longer re-argue the facts and challenge the statute as vague in application.  Therefore, while a facial vagueness challenge is jurisdictional, an as-applied vagueness challenge is non-jurisdictional and waived by a guilty plea.  Royer is thus barred from asserting an as-applied vagueness challenge for the first time on appeal.

Here, Royer was sentenced in 2004, but failed to challenge Section 924(c) as unconstitutionally vague before that time.  As a result, he cannot establish cause for his procedural default.  Moreover, Royer filed a petition under Section 2255 in 2009, but again failed to challenge Section 924(c) as unconstitutionally vague.  Even if his vagueness claim had

28

not been defaulted when he failed to raise it before sentencing in 2004, it surely was defaulted when he failed to raise it in his *habeas* petition in 2009.

Conclusion

For the above reasons, Royer's petition should be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney

_____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

29

CERTIFICATE OF SERVICE

I certify that on September 14, 2015, I will cause to be delivered by first class mail a copy

of the attached RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS to:

Randall Todd Royer
Reg. No. 46812-083
Federal Correctional Complex
P.O Box 1000
Petersburg, VA  23804


_____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov