IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



Randall Todd Royer,          )
                             )
          Petitioner,        )
                             )
     v.                      )     Civ. No. 1:15cv1021
                             )     Crim. No. 1:03:cr296
Eric D. Wilson,              )
                             )
          Respondent.        )

REPLY TO GOVERNMENT'S RESPONSE TO PETITION
FOR WRIT OF HABEAS CORPUS

## I.  Introduction

Petitioner has filed a petition for writ of habeas corpus
pursuant to 28 U.S.C. § 2241, arguing that his conviction of 18
U.S.C. § 924(c), use of a firearm during and in relation to a
crime of violence, should be vacated. Petitioner argues that this
conviction should be vacated because Johnson v. United States,
135 S.Ct. 2551 (2015), which held that the residual clause of the
Armed Career Criminal Act's definition of "violent felony" was
void for vagueness, also invalidates the parallel residual clause
of § 924(c)'s definition of "crime of violence." The Court has
ordered the government to show cause as to why the petition
should not be granted.

The government has filed a response to the petition, and it
fails therein to meet its burden. It argues that Petitioner's
claim is procedurally defaulted and waived by his guilty plea,
but facial vagueness challenges are jurisdictional and cannot be
defaulted or waived.-- and even if they could be defaulted,
Petitioner overcomes any default because Johnson renders him
actually innocent of his conviction and all more serious

dismissed charges. As to the merits of the claim, the government argues that Johnson does not affect § 924(c)'s residual clause because the ACCA's residual clause is "materially different." This argument falls short because the government exaggerates the differences between the two provisions and, more importantly, such differences are immaterial to Johnson's holding that the "ordinary case" test used to analyze the ACCA (and § 924(c)) is the source of the residual clause's vagueness. Finally, the government argues that Petitioner cannot bring his claim in a § 2241 petition because it does not meet § 2255's "savings clause." This argument fails as well: the law was settled at the time of Petitioner's conviction because the Fourth Circuit had held that the ACCA's residual clause was not void for vagueness, necessarily implying that § 924(c)'s residual clause was likewise constitutional. And insofar as Johnson applies to § 924(c), then the applicable law has certainly changed since Petitioner's first § 2255 motion. The Court may therefore grant habeas relief.

II.  Discussion

    A.  Petitioner's claim is not barred by procedural default or waiver

        1.  Petitioner's claim that he was convicted of a facially unconstitutional statute is not subject to the rules of procedural default or waiver

In its Response, the government argues that Petitioner's claim is procedurally defaulted and that his guilty plea waived his challenge to his conviction. Response at 9-14 (procedural default) and 28-29 (waiver and default). The government acknowledges that "a facial vagueness challenge is jurisdictional" and not subject to waiver, id. at 28, but it argues that §

2

924(c)(3)(B) is not facially vague, so Petitioner must be making a non-jurisdictional "as-applied" challenge. This circular argument fails because Petitioner is obviously advancing a facial vagueness argument, see, e.g., Petition at 8 (arguing that Johnson "renders [§§ 16(b) and 924(c)(3)(B)] void for vagueness"), and because, as described in the Petition and herein, the statute is in fact facially vague after Johnson. Although the government agrees in principle that facially vague challenges are jurisdictional and not subject to waiver, Petitioner explains below why that is so and why this fact obviates any need for the Court to consider the government's affirmative defenses of procedural default and waiver.

The Supreme Court has explained that "subject matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." United States v. Cotton, 555 U.S. 625, 630 (2002). Moreover, "[a] plea of guilty to a charge does not waive a claim that -- judged on its face -- the charge is not one which the State may not constitutionally prosecute." Menna v. New York, 423 U.S. 61, 63 n.2 (1975). Hence, challenges to a court's subject matter jurisdiction are not "subject to the normal rules of waiver and procedural default." Prou v. United States, 199 F.3d 37, 45 (1st Cir. 2000). See also United States v. Beasley, 495 F.3d 142, 147-48 (4th Cir. 2007)(procedural default rule applied because defendant's claim was not jurisdictional); United States v. Isaac, 655 F.3d 148, 155 (3d Cir. 2011)(jurisdictional defects "cannot be procedurally defaulted"); Clay v. Murray, 1991 U.S. App. LEXIS 15231 (4th Cir. 1991)(procedural default rule does not apply to Menna claims);

3

Colvin v. United States, 2014 U.S. Dist. LEXIS 12274 (W.D.N.C. Jan. 31, 2014)("The procedural default rule is generally inapplicable to claims challenging the subject matter of the court."). It follows that, "because jurisdictional claims may not be defaulted, a defendant need not show 'cause' to justify his failure to raise such a claim." United States v. Harris, 149 F.3d 1304, 1307-08 (11th Cir. 1998). See also Kelly v. United States, 29 F.3d 1107, 1113 (7th Cir. 1994)("Because a jurisdictional defect cannot be procedurally defaulted in the first place, it is therefore a non sequitor to suggest that a procedural default cannot be overcome because the defendant has not made an adequate showing of 'cause.'").

The government is correct, moreover, in acknowledging that "a facial vagueness challenge is jurisdictional[.]" Response at 28. See United States v. Brown, 752 F.3d 1344, 1354 n.6 (11th Cir. 2014)(stating that a defendant's argument that the charged statute was unconstitutional is a jurisdictional claim); United States v. Phillips, 645 F.3d 859, 863 (7th Cir. 2011)("A facially vague statute presents a jurisdictional issue" because its vagueness "prevent[s] a court from entering a judgment under the statute in any case and strip[s] the government of its ability to obtain a conviction against any defendant."); United States v. Yarbrough, 452 Fed. Appx. 186, 188 (3d Cir. 2011)(defendant's "challenge is jurisdictional because, if § 922(g)(1) is facially unconstitutional, the District Court lacked power to charge and convict him."); Journigan v. Duffy, 552 F.2d 283, 289 (9th Cir. 1977)(defendant's claim that he was prosecuted under an

unconstitutional statute falls under the rule that "a guilty plea does not bar those claims which go to the power of the state to invoke criminal process against the defendant.").

Hence, because jurisdictional claims are not subject to the rules of procedural default or waiver, and because -- as the government acknowledges -- "a facial vagueness challenge is jurisdictional," it follows that the Court may address the merits of Petitioner's facial challenge to § 924(c)(3)(B) and disregard the government's arguments as to procedural default and waiver.[1] See United States v. Saac, 632 F.3d 1203, 1208 (11th Cir. 2011) ("[A] guilty plea does not waive the right of an accused to challenge the constitutionality of the statute under which he is convicted."); United States v. Johnson, 437 F.3d 157, 160 n.2 (1st Cir. 2006)(challenges to the constitutionality of the statute of conviction are not subject to the rule of procedural default); United States v. Perlaza-Ortiz, 439 F.3d 1149, 1167 n.21 (9th Cir. 2004)(claims that the applicable statute is unconstitutional are jurisdictional and not waived by a guilty plea); United States v. Morgan, 437 F.3d 1067, 1071 (8th Cir. 2000)(Bye, J., concurring)("I am pleased that the majority opinion explicitly recognizes a facial constitutional challenge exception to the procedural default doctrine."); United States v.

---

[1] There is a technical difference between waiver and procedural default that is immaterial to the argument here. See Prou, 199 F.3d at 42 n.2 ("Technically, this case involves procedural default, in which a failure seasonably to raise a claim bars subsequent attempts to do so. Waiver, in contrast, represents an express decision by a party not to pursue a claim. Because all waiveable claims are by definition subject to procedural default, we use the terms interchangeably.").

Berry, 27 Fed. Appx. 190, 191 (4th Cir. 2001)(waiver provision of
defendant's guilty plea did not preclude appellate challenge to
the constitutionality of his statute of conviction).

> 2.   Petitioner's claim is not barred because he is
>       actually innocent of his statute of conviction and
>       all more serious dismissed charges

Petitioner asserts in his Petition that he meets the Schlup
actual innocence standard because Johnson renders § 924(c)(3)(B)
void along with his conviction. He further asserts that he meets
Bousley's proviso that he must show actual innocence of any "more
serious" charges forgone by the government in the course of plea
bargaining because Johnson applies equally to the § 924(c)
charges dismissed pursuant to his plea agreement. Petition at 13-
14. The government acknowledges that "several of the charges that
ultimately were dropped as part of the plea bargain involved
Section 924(c) and, therefore, could be subject to the same
vagueness challenge based on Johnson," but it argues that the
dismissed non-firearm charges "were at least as serious as the
offense to which [Petitioner] pled guilty." Response at 11. The
government's analysis is deeply flawed; the dismissed non-firearm
charges were clearly not more serious than the count to which
Petitioner pleaded guilty.

The relevant factual background is as follows. The
government dismissed the 14 counts against him charged in the
superseding indictment in return for Petitioner's plea of guilty
to two counts of a criminal information. Eight of the dismissed
counts (11, 18, 21, and 23-27) alleged violations of § 924 that
relied on the unconstituional crime-of-violence definition in §
924(c)(3)(B) and thus, as the government acknowledges, "could be

subject to the same vagueness challenge based on Johnson," and accordingly are exempt from the Bousley seriousness analysis insofar as Petitioner is actually innocent of those charges after Johnson. Notably, those charges of which Petitioner asserts actual innocence pursuant to Johnson encompass all of the counts the government argued were "more serious" than count one of the information in its responses to Petitioner's § 2255 motion and previous § 2241 motion. See Mem. Op. of Nov. 14, 2014 at n.5.

Of the six remaining counts, one charged a violation of 18 U.S.C. § 371 (conspiracy) and one a substantive violation of 18 U.S.C. § 960 (Neutrality Act). The government does not argue that these charges were more serious than the pleaded counts, perhaps because the former offense's statutory maximum penalty is a mere five years in prison and the latter's is only three.

Rather, the government argues that the remaining four counts were more serious than the pleaded counts. Count two alleged a violation of 18 U.S.C. § 2384 (seditious conspiracy), count three alleged a violation of 18 U.S.C. § 2339B (material support for a foreign terrorist organization); count four alleged a violation of 50 U.S.C. § 1705 (conspiracy to contribute services to the Taliban), and count five alleged a violation of 18 U.S.C. § 2339A (conspiracy to provide material support for terrorism). The pleaded counts, which the government alleges were less serious than these counts, charged violations of 18 U.S.C. § 924(c)(1)(A) (count one of the information) and 18 U.S.C. § 844(h)(2) (count two). A comparison of the penalties associated with the dismissed and pleaded counts reveals that the pleaded counts were clearly more serious -- even under the authorities cited by the

7

government.

Relying on United States v. Caso, 723 F.3d 215 (D.C. Cir. 2013), for the proposition that "courts compare the two charges under the United States Sentencing Guidelines" to determine which is more serious, Response at 11, the government proceeds to analyze the dismissed and pleaded counts under the purportedly applicable guidelines. Because under its analysis the challenged count's guideline recommendation equalled its statutory minimum of ten years of imprisonment, and the guideline recommendation for the dismissed counts was 360 months to life, the government concludes that the dismissed counts were more serious. The government's analysis collapses under scrutiny.

As an initial matter, the government fails to account for the fact that both pleaded counts carried statutory minimum sentences of ten years imprisonment -- sentences which by statute were required to run consecutively, for an aggregate minimum sentence of twenty years -- whereas the dismissed counts had no statutory minimum sentences at all. Just as important, the pleaded counts both carried statutory maximum sentences of life in prison, whereas, of the dismissed counts, counts two and three carried statutory maximum penalties of fifteen years and counts two and four carried statutory maximum penalties of twenty years. In other words, by statute, the court was required to sentence Petitioner to at least twenty years for the pleaded counts -- the equivalent of the statutory maximum penalties for counts two and four. The fact that the court would not have been statutorily obligated to sentence Petitioner to a single day in prison for the dismissed counts, but was required to sentence Petitioner to

at least twenty years for the pleaded counts, reveals the weakness of the government's argument.

Moreover, the statutory ranges of the counts at issue are a much better gauge of seriousness than the guidelines, particularly in the instant case. In the context of the Sixth Amendment's guarantee of a trial by jury, the Supreme Court has repeatedly held that the seriousness of a charge is determined chiefly by the maximum statutory penalty attached to that crime. Lewis v. United States, 518 U.S. 322, 326 (1996)("In evaluating the seriousness of the offense, we place primary emphasis on the maximum prison term authorized."); accord United States v. Nachtigal, 507 U.S. 1, 3 (1993); Blanton v. City of N. Las Vegas, 489 U.S. 538, 541-42 (1989); Baldwin v. New York, 399 U.S. 66, 68 (1970); Frank v. United States, 395 U.S. 147, 148 (1969); see also Duncan v. Louisiana, 391 U.S. 145, 159-161 (1968).

The reasons for this method are twofold. First, the maximum penalty offers an objective standard by which to measure the seriousness of a crime. See Lewis, 518 U.S. at 326 (citing Frank, 395 U.S. at 148). Second, "[t]he judiciary should not substitute its judgment as to seriousness for that of a legislature, which is 'far better equipped to perform this task, and [is] likewise more responsive to changes in attitude and more amenable to the recognition and correction of their misperceptions in this respect." Blanton, 489 U.S. at 541-42 (quoting Landry v. Hoepfner, 840 F.2d 1201, 1209 (5th Cir. 1988)(en banc)).

The Fourth Circuit has further held that this approach applies to Due Process challenges against involuntary medication.

In United States v. Evans, the Fourth Circuit relied on the
maximum penalty authorized by statute to measure the seriousness
of the defendant's offense, noting that "[s]uch an approach
respects legislative judgments regarding the severity of the
crime, while at the same time giving courts an objective standard
to apply." 404 F.3d 227, 237 (4th Cir. 2005); accord United
States v. Chatmon, 718 F.3d 369, 374 (4th Cir. 2013). In so
holding, the Evans court also recognized that using a defendant's
sentencing guideline range "would similarly respect legislative
judgments, while also giving courts an objective standard to
apply." 404 F.3d at 237-38. However, the court explained that
relying on the guideline range is "unworkable" when a Presentence
Report responsive to the charges in question is not available.
Id. at 238. A focus on the guideline range

> would simply be unworkable because at this stage in the
> proceedings, there is no way of accurately predicting what
> that range will be. The final guideline range is computed
> only after the district court makes findings of fact
> relevant to sentencing categories. These factual findings
> are based on the Presentence Report (PSR), which the
> Probation Office prepares pursuant to testimony presented
> at trial or the plea and a detailed investigation of the
> defendant. A focus on the probable guideline range as the
> barometer of seriousness would shift this fact-finding to
> a time before the defendant's trial or plea, before the
> Probation Office prepares its report[.]

Id. Though this observation came in the context of a pretrial
involuntary medication proceeding, its logic applies with equal
force where -- as here -- the court lacks a fully developed PSR
focused on the relevant charges.

Indeed, there exists no PSR as to Petitioner that addresses
the four dropped charges highlighted by the government. The
government can only hypothesize what sentence a PSR would have

called for with respect to those charges. Thus, measuring seriousness by guideline sentences would be an apples-and-oranges comparison: the Court would be forced to weigh (a) figures from a fully developed PSR addressing the two counts to which Petitioner pled, and (b) back-of-the-envelope conjecture about the four counts that were dropped. This asymmetrical approach would be both "unworkable" and inconsistent with the law of this circuit. Evans, 404 F.3d at 238.

Furthermore, the particularities of Counts Two, Three, Four, and Five could lead to unpredictable results in a PSR. Many aspects of a PSR depend on the specific offenses that the report is addressing. U.S.S.G. § 3E1.1 (2003) requires an offense level reduction of 2-3 points where the defendant "clearly demonstrat[es] acceptance of responsibility for his offense." The guidelines contemplate further deviation where defendants have provided "substantial assistance to authorities" or where "there exists an aggravating or mitigating circumstance...of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines..." U.S.S.G. §§ 5K1.1., 5K2.0 (2003). Such determinations are offense-specific and cannot be reliably made without robust fact-finding informed by a fully responsive PSR.

Thus, as in Evans, the Court must rely on the maximum penalty to measure seriousness, as it is an objective approach that respects legislative judgment. 404 F.3d at 237. Indeed, the government, while overlooking this considerable Supreme Court and Fourth Circuit precedent, relies on three out-of-circuit cases to argue that the guidelines should dictate the seriousness of a

12

charge, but it neglects to mention that these cases are neither binding nor reflective of a unanimous opinion among the Circuits that have addressed the issue. See United States v. Avery, 719 F.3d 1080, 1085 n.4 (9th Cir. 2013)(holding that the dismissed counts were not "more serious" because they "carried the same statutory penalties"); United States v. Scruggs, 714 F.3d 258, 265-66 (5th Cir. 2013)(holding that seriousness is measured by aggregating the statutory maximum sentences carried by the dropped and pleaded counts); Vanwinkle v. United States, 645 F.3d 365, 369 n.2 (6th Cir. 2011)(accepting defendant's concession that seriousness "is determined by looking at the statutory maximum sentence for each offense); Peveler v. United States, 269 F.3d 693, 700 (6th Cir. 2001)(determining seriousness with reference to statutory minimum sentences). Moreover, every district court case of this Circuit that Petitioner was able to locate addressing this issue used statutory range as the measure of seriousness. See Harris v. United States, 2015 U.S. Dist. LEXIS 93989 and n.1 (E.D.N.C. July 20, 2015); Elbert v. United States, 2014 U.S. Dist. LEXIS 46245 (E.D.N.C. April 3, 2014); Broyles v. United States, 2013 U.S. Dist. LEXIS 181799 (E.D. Va. Dec. 30, 2013); Hallman v. United States, 2013 U.S. Dist. LEXIS 124575 n.10 (D.S.C. Aug. 29, 2013); Brewington v. United States, 2012 U.S. Dist. LEXIS 161225 (E.D.N.C. Nov. 8, 2012).

Even if the appropriate measure of seriousness in this case were the guidelines, Petitioner could overcome his procedural default. To begin with, he can show actual innocence of at least two of the dropped counts. As to count three, charging a ....

13

conspiracy to contribute material support to Al Qaeda in violation of 18 U.S.C. § 2339B, this Court found Petitioner's codefendant not guilty of this offense as a matter of law because the government's theory of liability did not "fit the statutory definition of 'material support or resources.'" United States v. Khan, 309 F. Supp. 2d 789, 821 (E.D. Va. 2004). This finding compels a similar finding as to Petitioner since he and Khan were charged with the same conspiracy under an identical theory of liability.

As to count five, charging Petitioner with conspiring to contribute material support to terrorists under 18 U.S.C. § 2339A, Petitioner can show actual innocence as well. As the Fourth Circuit has explained, "[c]onspiracy to provide material support to terrorists was not made a crime until October 26, 2001; until that date, § 2339A was a substantive crime only." United States v. Khan, 461 F.3d 477, 489 (4th Cir. 2006). The court rejected Chapman and Khan's ex post facto challenge because the evidence purportedly showed their involvement in the alleged § 2339A conspiracy after the date of the statute's amendment. As to Petitioner, however, there is no evidence before the Court of his participation in a § 2339A conspiracy beyond October 26, 2001. Thus, the Court should find that Petitioner meets the Schlup actual innocence standard as to counts three and five.[2]

---

[2] This Court has previously stated that, on the record before it, "there is no reasonable likelihood that Royer would have been acquitted of any count in the superseding indictment." Mem. Op. of Feb. 2012 at 24. However, neither Khan's acquittal of count three nor the ex post facto issue as to count five had been brought to this court's attention in the § 2255 proceeding.

As to counts two and four, Petitioner need not show actual innocence of those counts even under the government's erroneous guidelines-based methodology for determining seriousness because its guidelines analysis as to those counts is flawed. Neither of those counts would have been subject to a § 3A1.4 terrorism enhancement because it is applicable only to "federal crime[s] of terrorism" as defined by 18 U.S.C. § 2332b(g)(5), and neither 50 U.S.C. § 1705 nor 18 U.S.C. § 2384 have ever been identified by that provision as crimes of terrorism. 18 U.S.C. § 2332b(g)(5). Thus, with a base level between twenty-six and twenty-eight and Petitioner's criminal history of I, see PSR at 40, counts two and four would carry, at most, guidelines sentences of 63 to 97 months. This is far lower than the twenty-year sentence recommended by the guidelines (and mandated by statute) that Petitioner received for the two pleaded counts. Thus, even under the government's erroneous guidelines-focused method for determining seriousness, Petitioner's claim may be reviewed on the merits.

   B.   Johnson's holding extends to § 924(c)(3)(B)

The government makes several arguments in support of its position that Johnson does not apply to § 924(c)'s residual clause. In the end, none of these arguments are availing because Johnson invalidated the James "ordinary case" analysis, and, a fortiori, all statutory provisions that compel such an analysis. Because the only way to apply § 924(c)(3)(B) is to use the "ordinary case" test, Johnson has invalidated that provision. The government does not and cannot argue that the "ordinary case" test survives Johnson, and it does not and cannot argue that §

924(c)(3)(B) can be applied without that test. Therefore, there is literally no conceivable argument the government can advance that the provision survives Johnson.

Nevertheless, the government attempts to argue that Johnson does not affect § 924(c)(3)(B) because that provision is "materially different" than the ACCA residual clause. Aside from the fact that this argument fails by definition because it does not address Johnson's invalidation of the ordinary case test, it also fails because the government exaggerates or mischaracterizes the differences between § 924(c)(3)(B) and the ACCA.

### 1. It is irrelevant that the enumerated offenses are absent

As the government points out, unlike the ACCA residual clause, § 924(c)(3)(B) does not have a list of enumerated offenses. However, the enumerated offenses were by no means what "ultimately convinced the Johnson Court of the ACCA's vagueness." Resp. at 17. The real significance of the enumerated offenses to the Johnson court's analysis was their inability to serve as a touchstone for the risk level necessary to qualify an offense as a "violent felony" and obviate the need for the "ordinary case" test. This is illustrated by the Court's discussion of Begay's failure to provide a concrete alternative to the "ordinary case" test. In Begay, the Johnson court explained,

> [t]he Court held that in order to qualify as a violent
> felony under the residual clause, a crime must resemble the
> enumerated offenses "in kind as well as in degree of risk
> posed" ...Alas, Begay did not succeed in bringing clarity to
> the meaning of the residual clause. It did not (and could
> not) eliminate the need to imagine the kind of conduct
> typically involved in a crime.

16

_Johnson_ at 2559. Likewise, in a passage discussing the uncertainty created by the residual clause as to "how much risk it takes for a crime to qualify as a violent felony," the Court stated:

> It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction. By asking whether the crime "otherwise involves conduct that presents a serious potential risk," moreover, the residual clause forces courts to interpret "serious potential risk" in light of the four enumerated crimes -- burglary, arson, extortion, and crimes involving explosives. These offenses are "far from clear in respect to the degree of risk each poses."

_Id._ at 2558. Here the Court plainly states that the primary source of the ACCA's uncertainty as to risk level is the need to apply the "serious potential risk" standard "to a judge-imagined abstraction." The enumerated offenses shed no light on risk level since they themselves "are far from clear in respect to the degree of risk each poses," and thus provide no reliable gauge for unacceptable level of risk. _Johnson_'s discussion of the enumerated offenses was aimed at explaining why the Court's previous cases relying on them to determine risk level were doomed to fail; _Johnson_ did not, however, identify the enumerated offenses as the _source_ of the ACCA's ambiguity. Rather, _Johnson_ identified that source as the need to apply the "ordinary case" test.

Indeed, the absence of the enumerated offenses in § 924(c)(3)(B) arguably renders it _more_ vague than the ACCA in that it leaves the "substantial risk" standard unmoored to any example crimes. The Ninth Circuit has observed that the ACCA residual clause and § 924(c)(3)(B)

17

> are similar because they apply to crimes that involve a
> serious or substantial risk that physical force will occur
> during the course of the offense. The major difference
> between the two statutes is that the ACCA applies <u>only</u> to
> seriously dangerous crimes that are similar to the
> enumerated offenses, whereas 18 U.S.C. § 924(c)(1) applies
> to all substantially dangerous offenses.

<u>United States v. Chandler</u>, 743 F.3d 648, 653-54 (9th Cir. 2013)

(emphasis added). The Fourth Circuit has likewise noted that the

absence of the enumerated offenses in 18 U.S.C. § 16(b) -- which

is identical to § 924(c)(3)(B) -- renders its sweep broader than

the ACCA residual clause. In <u>United States v. Avila</u>, 770 F.3d

1100, 1106 (4th Cir. 2014), in which it held that the <u>James</u>

"ordinary case" test applies to § 16(b), the court explained that

> unlike the ACCA provision analyzed in <u>Descamps</u>, 18 U.S.C. §
> 16(b) does not contain a roster of enumerated offenses or
> list generic burglary as a qualifying crime. Instead, §
> 16(b) speaks in descriptive terms of felonies that carry a
> substantial risk that force will be used. Consequently, the
> crime of violence definition in § 16(b) is <u>not</u> <u>restricted</u> to
> generic burglary...

<u>Id.</u> (emphasis added).

Finally, the government asserts that the enumerated offenses

were the factor that distinguished for the Court the ACCA

residual clause from other statutes requiring risk-based

assessments. Resp. at 18. But, while the Court did note that most

of the statutes cited by the Solicitor General and the dissent

lacked enumerated offenses, it deemed it "[m]ore important[]"

that

> almost all of the cited laws require gauging the riskiness
> of conduct in which an individual defendant engages <u>on a</u>
> <u>particular occasion</u>. As a general matter, we do not doubt
> the constitutionality of laws that call for the application
> of a qualitative standard such as "substantial risk" to
> real-world conduct...The residual clause, however, requires
> application of the "serious potential risk" standard to an
> idealized ordinary case of the crime.

Johnson at 2561. It is clear that the Court's position is actually opposite to the government's: the statutes cited by the Solicitor General and the dissent did not have a list of example offenses, but "[m]ore importantly," "almost" none required the use of the "ordinary case" test, and for that reason were unaffected by the holding that the residual clause was void for vagueness. This language clearly leaves the door open for the argument that some of the offenses cited by the Solicitor General -- including §§ 16(b) and 924(c)(3)(B) -- are affected by Johnson's holding because they do require the use of the ordinary case test. Indeed, as discussed below, that is exactly what the Solicitor General did argue as to those statutes in the course of litigating Johnson.

In sum, while § 924(c)(3)(B) has no enumerated offenses, and while the ACCA's enumerated offenses played a role in the Johnson court's analysis, the government exaggerates and mischaracterizes that role. Their significance was their failure to serve as a reliable touchstone for unacceptable risk level, leaving courts with no recourse but to an unworkable, unconstitutional ordinary case test -- the test courts must also use for § 924(c)(3)(B).

> 2.   Section 924(c)(3)(B) is not materially narrower
>       than the ACCA

The government argues that Johnson does not apply to § 924(c)(3)(B) because it is narrower than the ACCA residual clause. Specifically, it argues that whereas the ACCA requires courts to "go[] beyond deciding whether creation of risk is an element of the crime," Johnson at 2557, textual differences between the statutes mean that no such inquiry is required under

19

§ 924(c)(3)(B). The government is mistaken; both statutes require this inquiry because it is inherent in statutes requiring the ordinary case test. As <u>Johnson</u> explained:

> Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. The court's task goes beyond deciding whether creation of risk is an element of the crime. That is so because, unlike the part of the definition that asks whether the crime "has <u>as an element</u> the use...of physical force," the residual clause asks whether the crime "<u>involves conduct</u>" that presents too much risk of physical injury.

<u>Id.</u> (emphasis in original).

In other words, the ordinary case test requires a court to "go[] beyond deciding whether creation of risk is an element of the crime" because, unlike the elements clause, the ACCA's residual clause requires a court to ascertain whether the acts that constitute the crime involve the <u>risk</u> of injury. This is precisely the inquiry courts must undertake under § 924(c)(3)(B). Under that provision, courts do not ask whether an offense has as an element the use of force, as they do under § 924(c)'s elements clause, § 924(c)(3)(A). Rather, as under the ACCA, courts analyzing an offense under § 924(c)(3)(B) must decide whether the crime "involves a substantial risk" that the perpetrator will use force. Thus, just as <u>Johnson</u> pointed out with respect to the ACCA, § 924(c)(3)(B) does not ask whether risk is an <u>element</u> of the crime. See <u>Aguilar v. AG of the United States</u>, 663 F.3d 692, 696 n.8 (3d Cir. 2011)(§ 16(b) is broader than the elements clause of § 16(a) "because it does not require force to be an element of the crime."). Rather, just as with the ACCA, § 924(c)(3)(B) asks whether the "ordinary case" of the offense

involves too much risk of the use of force. The two provisions are thus materially identical in this respect. See United States v. Gomez-Leon, 545 F.3d 777, 788-89 (9th Cir. 2008)("The serious risk of injury test [of the ACCA] resembles the substantial risk/ use of force test [of § 16(b)] because it is based on the degree of risk that the commission of the underlying offense will cause a particular result.").

The government claims that § 924(c)(3)(B) is materially narrower than the ACCA because it requires that force be used "in the course of committing the offense." It argues that said language cures the vagueness problem involved in the ACCA's requirement that a court look beyond the acts that make up a crime. But several courts have rejected an interpretation of this language that would impose a temporal limitation on the statute's coverage. For example, in Prakash v. Holder, 579 F.3d 1033 (9th Cir. 2009), the defendant argued that solicitation to commit rape and assault was not a § 16(b) crime of violence because it could be committed by the mere utterance of words, "and any actual force would not come until sometime later, after the soliciation offense had been completed." Id. at 1036. The court rejected this argument.

> We...hold that solicitation to commit rape and assault are crimes of violence, even if the actual violence may occur after the solicitation itself. Section 16(b) turns on the risk of physical force as a consequence of the criminal conduct at issue, not on the timing of the force...The words in the statute "in the course of committing the offense" require a causal link between the crime and the physical force...Those words do not impose a chronological limitation. It is the risk of violence flowing from a given crime that this statute is concerned with, not necessarily when in a chronological sequence the violence occurs. Prakash has not identified any logical reason why violence that might take place a few minutes, hours, or even days

21

> after the solicitation to commit rape or assault has been
> committed should be disregarded, or why the statute should
> be interpreted in that fashion. We see no reason to do so.
> The interpretation of the phrase "in the course of
> committing the offense" as a chronological limitation does
> not make sense in the context of determining whether a given
> crime is a "crime of violence."

Id. at 1036-37. Judge Ellis of this district likewise rejected an

interpretation of this language like that urged by the government

here in United States v. Lindh, 212 F. Supp. 2d 541 (E.D. Va.

2002). The defendant in that case argued that providing material

support to terrorists was not a crime of violence under §

924(c)(3)(B) because the offense could be committed without force

being used "in the course of committing the offense." The court

wrote:

> The phrase "in the course of committing the offense" does
> not mean, as Lindh suggests, that courts must be blind to
> the natural consequences -- the natural risks -- attendant
> to the aiding and abetting of terrorism proscribed by
> Section 2339B. Rather, the statute requires assessment of
> the risks that may result from providing material support or
> resources to terrorists in a manner that Section 2339B
> forbids. It takes little imagination to conclude that
> providing material support to a terrorist organization
> creates a substantial risk that the violent aims of the
> terrorists will be realized.

Id. at 579-80.

What Prakash and Lindh held was that a person does not

escape liability through the "in the course of committing the

offense" language simply because the force that results from his

actions may not manifest until after the acts that technically

make up the offense are completed. This was also the implicit

reasoning in United States v. Ayala, 601 F.3d 256 (4th Cir.

2010), in which the Fourth Circuit held that a conspiracy to

commit a crime of violence qualified as a § 924(c)(3)(B)

predicate because the conspirators' agreement has "substantially

increased the risk that their actions will result in serious physical harm to others." Id. at 267. Notably, the court based this holding on United States v. White, 571 F.3d 365 (4th Cir. 2009), which held that conspiracy to commit a crime of violence was a "violent felony" under the ACCA residual clause, implying that the temporal reach of the risk inquiry under § 924(c)(3)(B) and the ACCA is coextensive. The Eleventh Circuit has similarly refused to impose a temporal limitation on § 924(c)(3)(B). See United States v. McGuire, 706 F.3d 1333, 1337-38 (11th Cir. 2013) (holding that attempting to disable an aircraft was a crime of violence under § 924(c)(3)(B) because "[i]t makes little difference that the physical act, in isolation from the crime, can be done with a minimum of force; we would not say that laying spikes across a roadway is a non-violent crime because laying something upon the ground is not a forceful act.").

Indeed, as the Third Circuit has observed, the government's interpretation of the "in the course of committing the offense" language is

> too narrow because it would prevent burglary -- the paradigmatic § 16(b) crime as discussed by the Supreme Court in Leocal -- from being considered a crime of violence under § 16(b). Generic burglary requires "an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime." As such, the requisite elements of a burglary are complete once the burglar enters and possesses the necessary mental intent. However, the substantial risk that the burglar will use force comes from the possibility that the burglar will encounter another during the course of the burglary; it is irrelevant that the technical elements have already been accomplished.

Henry v. Board of Immigration, 493 F.3d 303, 310 (3d Cir. 2007). The Third Circuit's analysis of burglary under § 16(b) is of great significance because it perfectly mirrors Johnson's

23

analysis of the ACCA:

> [T]he inclusion of burglary...among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone. The act of ...breaking and entering into someone's home does not, in and of itself, normally cause physical injury. Rather, the risk of injury arises...because the burglar might confront a resident in the home <u>after</u> breaking and entering.

Johnson at 2559. Obviously, if burglary's inclusion in the ACCA's enumerated offenses "confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone," and if burglary is the "classic example" of a § 16(b) offense, Leocal at 10, then the temporal scope of the risk-based inquiry under the two statutes is identical.

The government further argues that § 924(c)(3)(B) is materially narrower than the ACCA because it refers to the risk of force rather than the risk of injury. The government supports this argument with reference to a Leocal footnote that appears to suggest that the language of the ACCA residual clause would cover the accidental effects of a person's conduct, whereas § 16(b) would not.

Petitioner does not deny that the difference between a risk of "force" and a risk of "injury" means that, at the margin, a few offenses may qualify under one residual clause but not another. But see United States v. Keelan, 786 F.3d 865, 871 (11th Cir. 2015)("The government argues our precedent mandates every crime of violence under § 4B1.2 is necessarily a crime of violence under U.S.S.G. § 16(b)."). It hardly means, however, that the two statutes do not suffer from the same

unconstitutional level of indeterminacy. Indeed, in litigating
Johnson, the government itself, through the Solicitor General,
stated:

> Although Section 16 refers to the risk that force will be
> used rather than injury will occur, it is equally
> susceptible to petitioner's central objection to the
> residual clause: Like the ACCA, Section 16 requires a court
> to identify the ordinary case of the commission of the
> offense and to make a common sense judgment about the risk
> of confrontations and other violent encounters.

Johnson v. United States, S. Ct. No. 13-7120, Supplemental Brief
of Respondent United States at 22-23 (available at 2015 WL
1284964 at *22-*23). The Solicitor General was right, and this
Court should hold the government to its concession.

Moreover, the Leocal footnote simply does not support the
government's argument that the scope of the inquiries under the
two statutes are different. Contrary to the Court's apparent
implication that the language of the ACCA would cover the
incidental, unintended effects of a person's actions -- such as
drunk driving -- the Court went on to hold in Begay that drunk
driving was not an ACCA offense because "the conduct for which
the drunk driver is convicted (driving under the influence) need
not be purposeful or deliberate." Begay, 553 U.S. at 145. Thus,
"[d]espite the slightly different definitions" of the ACCA and §
16(b), "the Supreme Court's holding in Begay prefectly mirrored
the analysis in Leocal..." Jiminez-Gonzalez v. Mukasey, 548 F.3d
557, 562 (7th Cir. 2008). See also Gomez-Leon at 789 ("Following
Begay, it is unclear whether there is any meaningful difference
between the two risk-based approaches" of § 16(b) and the ACCA).

In sum, and contrary to the government's argument, nothing
about the language of § 924(c)(3)(B) "limits its reach and avoids

the kind of speculation about extra-offense conduct that <u>Johnson</u> denounced." Resp. at 21. The scope of inquiry under the two statutes is identical and <u>Johnson</u> applies equally to both.

> ### 3. The Supreme Court's repeated failures to resolve the ACCA residual clause do not bear on <u>Johnson</u>'s application to § 924(c)(3)(B)

The government's argument that <u>Johnson</u> does not apply because the Supreme Court has not repeatedly tried and failed to construe § 924(c)(3)(B) is simply mistaken. That is because the Supreme Court's failures were not simply failures to construe the ACCA's residual clause, they were failures to construe statutes that "require[] a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious risk of physical injury." <u>Johnson</u> at 2557. As the Court explained, "<u>James</u>, <u>Chambers</u>, and <u>Sykes</u> failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition." <u>Id.</u> at 2559. Likewise, "<u>Begay</u> did not succeed in bringing clarity to the meaning of the residual clause" because "[i]t did not (and could not) eliminate the need to imagine the kind of conduct typically involved in a crime." <u>Id.</u> Thus, what the Supreme Court failed to construe in <u>James</u>, <u>Chambers</u>, <u>Sykes</u>, and <u>Begay</u> was not merely an individual statute, it was a <u>species</u> of statute: the sort that "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." <u>Id.</u> at 2557. Because § 924(c)(3)(B) is a member of this class of statutes, <u>Avila</u>, 770 F.3d at 1108 (holding that § 16(b) must be analyzed under the <u>James</u> "ordinary case" test), the Supreme

26

Court's failures "to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intution" were also failures to establish a constitutional construction of § 924(c)'s residual clause.

That the Supreme Court's struggle to interpret the ACCA was at bottom a struggle to interpret the class of provisions requiring the ordinary case test is revealed by the fact that the analytical methodology used by the Court in its ACCA cases -- and criticized in Johnson -- mirrors that used by the lower courts to analyze offenses under the language of § 924(c)(3)(B). For example, even before James and Avila, the Fourth Circuit used a test essentially identical to the ordinary case test for § 16(b), aimed at determining whether most instances of an offense involved the use of force. This determination involves (1) a statistical analysis of the law reporters, and (2) "common sense." United States v. Aragon, 983 F.3d 1306, 1314 (4th Cir. 1993)(stating that, in determining whether an offense is a crime of violence under § 16(b), the Fourth Circuit "look[s] to a common sense understanding of the crime as well as reported cases discussing the crime.")(citing United States v. Thompson, 891 F.2d 507 (4th Cir. 1989)). See also United States v. Bonetti, 277 F.3d 441 (4th Cir. 2002)(employing the Thompson "common sense" test to conclude that an offense was a crime of violence under § 16(b)).

Not coincidentally, given the identical nature of the provisions, the Supreme Court used the same methods in its failed attempts to construe the ACCA -- methods discredited by Johnson.

27

"How does one go about deciding what kind of conduct the 'ordinary case' of a crime involves? A statistical analysis of the state reporter?" the Johnson court asked rhetorically. Johnson at 2557 (citation removed). As for "common sense:"

> [C]ommon sense is a much less useful criterion than it sounds -- as Sykes itself illustrates. The Indiana statute involved in that case covered everything from provoking a high-speed car chase to merely failing to stop immediately after seeing a police officer's signal. How does common sense help a federal court discern where the "ordinary case" of vehicular flight lies along this spectrum? Common sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes; there is no reason to expect it to far any better with respect to thousands of unenumerated crimes.

Id. Thus, with Johnson, the fourth circuit's methodology for analyzing offenses under the language of § 924(c)(3)(B) has fallen along with the identical methodologies of James, Chambers, Begay, and Sykes. There is no better illustration that the Supreme Court's struggles in these cases were with the class of "ordinary case" provisions rather than with just one member of that class in isolation.

The government points to the fact that the Supreme Court has addressed the language of § 924(c)(3)(B) in only one significant decision, Leocal, and asserts that this decision "caused no controversy among the justices." Resp. at 22. Leocal, however, was issued before James and before the residual clause vagueness controversy began brewing; the parties, moreover, did not raise the issue of vagueness in Leocal. However, in his dissent in James, Justice Scalia -- the author of Johnson -- lumped § 16(b) in with the ACCA in its indeterminacy:

> It will take decades, and dozens of grants of certiorari, to allocate all of the Nation's crimes to one or the other side of this entirely reasonable and entirely indeterminate

28

Johnson, the fourth Circuits' methodology

> line. Compare ante, at 204, 167 L.Ed. 2d at 545 (concluding
> that attempted burglary poses sufficient risk), with Leocal
> v. Ashcroft, 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed. 2d 271
> (2004)(concluding that driving under the influence of
> alcohol does not pose a 'substantial risk that physical
> force against the person or property of another may be
> used," 18 U.S.C. § 16(b)).

James, 550 U.S. at 216 (emphasis added). Justice Scalia thus

regarded Leocal and James as part of the same dubious enterprise

-- attempting to divine the risk level of crimes in the ordinary

case -- and he regarded the § 16(b) and the ACCA to be

adumbrating the same "entirely indeterminate line."

Accordingly, the government's argument that Johnson does not

apply to § 924(c)(3)(B) because it was not specifically the

subject of the Supreme Court's prior ACCA cases misses the mark.

### 4. The Court did not intend that Johnson be limited to Section 924(e)(2)(B)

As discussed in the Petition at 9 and supra at 18-19, the

passage from Johnson in which the Court distinguished the ACCA

from "most" statutes cited by the government and dissent actually

supports the argument that Johnson invalidates all provisions

requiring an ordinary case test. For the sake of brevity

Petitioner refers the Court to these previous discussions.

### 5. A facial challenge to § 924(c)(3)(B) is appropriate

The government claims that Petitioner cannot mount a facial

challenge to § 924(c)(3)(B). The government is incorrect to the

extent that it implies that facial challenges are permitted only

under the First Amendment. Resp. at 23. In fact, one can make a

facial challenge "under any otherwise enforceable provision of

the constitution." See City of Los Angeles v. Patel, 135 S. Ct.

2443, 2449 (2015); see also Chicago v. Morales, 527 U.S. 41

(1999)(holding that an anti-loitering law was unconstitutional on its face); Richard Fallon, Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 917-18 (2011)(noting that the Supreme Court has adjudicated a large portion of facial challenges on the merits).

The government also appears to argue that Petitioner may not bring a facial challenge because he has violated § 924(c)(3)(B)'s "hard core." Resp. at 5. First, the government is begging the question because it assumes that the provision has a hard core. Citing Leocal, the government identifies burglary as belonging to § 924(c)(3)(B)'s "hard core." Resp. at 24. But as noted infra at 24, Johnson has cast considerable doubt on how much risk the ordinary case of burglary actually poses; indeed, Johnson identified the presence of burglary in the ACCA's enumerated offenses as evidence of the residual clause's creation of "uncertainty about how much risk it takes for a crime to qualify as a violent felony." Johnson at 2559. If burglary represents § 924(c)(3)(B)'s "hard core," then after Johnson's analysis of burglary, § 924(c)(3)(B)'s core seems elusive, if it exists at all.

Second, the government doesn't explain how Petitioner's conviction implicates § 924(c)(3)(B)'s alleged hard core. The predicate offense underlying Petitioner's conviction of count one of the criminal information was conspiracy to violate the Neutrality Act. Even if the Neutrality Act itself falls under § 924(c)(3)(B)'s alleged hard core, Johnson casts doubt on Ayala's holding that conspiracy to commit a crime of violence is a § 924(c) crime of violence, insofar as Ayala adopted this Circuit's

now-abrogated decision in White. Petitioner does not deny that
"there will be straightforward cases under the residual clause"
of § 924(c) "because some crimes clearly pose" a substantial risk
that force will be used. Johnson at 2560. But after Johnson,
burglary is not so straightforward, and neither is conspiracy.
Id. at 2561. And Johnson clarified that its decisions "refute any
suggestion that the existence of some obviously risky crimes
establishes the residual clause's constitutionality." Id.
Because the government fails to demonstrate that § 924(c)(3)(B)
has a "hard core," much less that Petitioner's conduct fell
within it, the Court should reject its argument that he
cannot mount a facial challenge to the statute.

    Finally, the government admonishes the Court that its "duty
is to construe, rather than to condemn, a statute." But the
government fails to explain how this or any court is supposed to
construe § 924(c)(3)(B) now that Johnson has (1) overruled James
and abolished the "ordinary case" test that the Fourth Circuit has
mandated to be used for analyzing § 16(b) offenses; and (2)
effectively abolished the Fourth Circuit's "common sense" and
"most cases" methods for determining "substantial risk." If the
government had any idea what a constitutionally sound method for
analyzing offenses under §§ 924(c)(3)(B) and 16(b) might be
after Johnson, it certainly would have explained what it was. The
truth is that, just like the ACCA, there is no way to construe
these statutes in a way that "prevents the risk comparison
required...from devolving into guesswork and intuition." Id. at
2559.

C.   Jurisdiction

The government argues that Petitioner does not meet the first two prongs of In re Jones and that, as a result, Petitioner may not bring his claim in a petition under 28 U.S.C. § 2241. As to the first prong, the government argues that at the time of Petitioner's guilty plea in 2004, "even the question of whether the ACCA was unconstitutionally vague was hardly settled law." Resp. at 27. The government is mistaken. Years before Petitioner's conviction, the Fourth Circuit expressly held that the ACCA was not unconstitutionally vague. See United States v. Presley, 52 F.3d 64, 88 (4th Cir. 1995)(quoting United States v. Sorenson, 914 F.2d 173, 175 (9th Cir. 1990). This holding settled the issue of the ACCA's vagueness in the Fourth Circuit at the time of Petitioner's conviction, He therefore meets the first Jones prong.

The government's argument as to the second Jones prong goes to the merits of Petitioner's argument that Johnson applies to § 924(c)(3)(B). Insofar as Petitioner prevails on the merits, he meets this Jones prong as well.

III.  Conclusion

For all of the foregoing reasons, the Petition for writ of habeas corpus should be granted.

                              Respectfully submitted,


Dated: October 19, 2015       _____
                              Randall Todd Royer

## CERTIFICATE OF SERVICE

I certify that on this 19th day of October, 2015, I caused a copy of the foregoing to be mailed to counsel for the government.



Randall Royer
46812-083
Federal Correctional Complex
P.O. Box 1000
Petersburg, VA  23804

CERTIFIED MAIL

7011 3500 0003 4597 4753

⇔46812-083⇔
Court Clerk
401 Courthouse SQ
2nd Floor
Alexandria, VA 22314-5704
United States