IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

RANDALL TODD ROYER,                    )
                                       )
            Movant,                    )
                                       )
      v.                               )    No. 1:16-cv-621 (LMB)
                                       )    Crim. No. 1:03-cr-296-1 (LMB)
UNITED STATES OF AMERICA,              )
                                       )
            Respondent.                )

MEMORANDUM OPINION

Before the Court is movant Randall Todd Royer's ("movant" or "Royer") Motion to

Vacate Under 28 U.S.C. § 2255 [Dkt. No. 842]. For the reasons that follow, Royer's motion will

be granted.

I.     BACKGROUND

A.  **Factual Background**

On June 25, 2003, a grand jury in the Eastern District of Virginia returned an indictment

[Dkt. No. 1] charging Royer and ten other defendants[1] with a number of offenses, all arising out

of their preparations for violent jihad overseas and, with respect to some defendants including

Royer, their travel to Pakistan to train with Laskhar-e-Taiba ("LET"), a militant group that was,

at the time, "primarily engaged in using military means to oust India from Kashmir," Presentence

Report ("PSR") [Dkt. No. 788] ¶ 93. In August and September 2003, four of the co-defendants

pleaded guilty and, on September 25, 2003, a grand jury returned a 32-count superseding

---

[1] The other ten defendants charged in the indictment were Masoud Ahmad Khan ("Khan"),
Ibrahim Ahmed Al-Hamdi ("Al-Hamdi"), Yong Ki Kwon ("Kwon"), Muhammed Aatique
("Aatique"), Seifullah Chapman ("Chapman"), Hammad Abdur-Raheem, Donald Thomas
Surratt II, Caliph Basha Ibn Abdur-Raheem, Khwaja Mahmood Hasan ("Hasan"), and Sabri
Benkhala.

indictment [Dkt. No. 167] charging Royer and the remaining six co-defendants with various offenses.

On January 16, 2004, Royer pleaded guilty to a two-count criminal information under a written plea agreement, and the government agreed to dismiss all of the counts in the superseding indictment as they related to Royer. [Dkt. Nos. 373 & 375]. Count One of the criminal information charged Royer with aiding and abetting the use and discharge of a semi-automatic pistol by co-defendants Khan, Kwon, Aatique, and Hasan in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c), and specified that the crime of violence in question was a violation of Count One of the superseding indictment, which charged a conspiracy to commit various offenses against the United States of America, in violation of 18 U.S.C. § 371. Count Two of the criminal information, which is not at issue in the present motion, charged Royer with aiding and abetting the carrying of an explosive during the commission of a felony that may be prosecuted in a United States court, in violation of 18 U.S.C. §§ 2, 844(h)(2).

As part of his guilty plea, Royer agreed to a Statement of Facts, which described a set of facts that Royer both agreed were true and agreed that the government could have proven beyond a reasonable doubt at trial. See PSR ¶¶ 89-132. As the Statement of Facts described, Royer first joined a militant Muslim organization in late 1994 or early 1995, when he took a leave of absence from college and traveled to Bosnia to take part in the then-ongoing Bosnian War. Id. ¶ 95. While in Bosnia, Royer "participated in about six weeks of military training and engaged in several battles." Id. Approximately four years later, Royer returned to the Balkans, this time traveling to Macedonia "with the intent of fighting for ethnic Albanian Muslims against Serb forces in Kosovo"; however, after Royer arrived, he "learned that the authorities were not

allowing people like him to serve as foreign volunteers" and he returned to the United States. Id. ¶ 96.

In January 2000, about eight months after Royer's return, he and Al-Hamdi decided to travel to Chechnya, where they could fight for besieged Muslims. Id. ¶ 97. Because Al-Hamdi had previously attempted to get to Chechnya but had been told that he would not be accepted as a fighter without military training, Royer and Al-Hamdi decided to first travel to LET camps in Pakistan to allow Al-Hamdi to receive military training and to make contacts that could get them accepted as fighters in Chechnya. Id. In February 2000, Royer and Al-Hamdi attempted to obtain visas to enter Pakistan, but Al-Hamdi was unable to obtain a visa because he had a diplomatic passport. Id. ¶ 99. Undeterred, Royer traveled to Pakistan by himself, where he made his way to the LET office in Lahore and told the LET representatives that he had previously fought in Bosnia and wanted to fight in Chechnya. Id. ¶¶ 100-01. The representatives verified his story about having fought in Bosnia and told him that LET could help him get to Chechnya. Id. ¶ 101.

At some point while in Pakistan, Royer "realized that he would not have time to travel to Chechnya within the time frame he had allotted himself before returning to his pregnant wife in Bosnia," and he instead decided to help LET with its publicity efforts by establishing a bulletin board on the Internet for LET, writing and publishing nine bulletins on behalf of LET, which provided information about its recent exploits and explained its positions on various issues. Id. ¶¶ 102-04. Royer also traveled to LET training camps and to the front line in Kashmir, where he shot some number of live rounds at Indian positions with a machine gun. Id. ¶ 105.

In May 2000, Royer returned to the United States, where he continued to assist LET with its publicity efforts by editing bulletins, establishing a new group on the Internet to "provide an outlet for political commentary" from LET rather than battle reports, and posting messages to

this new group. Id. ¶¶ 106-07. In addition, Royer told a variety of friends about his experience with LET and encouraged others to travel to Pakistan to train with the group. Id. ¶ 108.

Royer also used his contacts with LET to help various individuals access the group's training camps. Specifically, Royer told an LET member about Al-Hamdi's desire to train with the group and provided that member with Al-Hamdi's name and information, telephoned LET about Aatique's desire to visit a camp and provided Aatique with a letter of reference and an LET telephone number, arranged for someone from LET to pick up co-defendant Chapman in Karachi and take him to the camps, provided an LET contact in Pakistan with physical descriptions of Kwon and Hasan, and provided Kwon with instructions on how to contact LET once he arrived in Pakistan. Id. ¶¶ 111, 115, 116, 121. Each of these individuals in fact traveled to Pakistan and spent some amount of time at the LET camps. Id. ¶¶ 113, 116, 122, 128. In addition, Al-Hamdi went on a mission with LET, where "his group fired rocket-propelled grenades and automatic weapons at Indian troops in Kashmir," and each of Khan, Aatique, Hasan, and Kwon fired an AK-47 rifle, a 12 mm anti-aircraft gun, a machine gun, and a rocket-propelled grenade during training exercises at the LET camps. Id. ¶¶ 113, 128.

On April 9, 2004, Royer was sentenced to a total of 240 months imprisonment, with credit for time served, as well as 3 years of supervised release. [Dkt. No. 506]. This sentence consisted of consecutive sentences of 120 months imprisonment and concurrent terms of 3 years of supervised release on each of Counts One and Two.[2]

On March 16, 2009, Royer filed his first Motion to Vacate Under 28 U.S.C. § 2255 [Dkt. No. 705], which raised issues unrelated to the present motion. The Court dismissed this motion

---

[2] On December 9, 2016, Royer's sentence was reduced to time served. [Dkt. No. 873]. Three days later, he was released from the custody of the Bureau of Prisons and began serving the supervised release portion of his sentence.

as untimely. [Dkt. No. 760]. On June 25, 2014, Royer filed a Petition for a Writ of Habeas Corpus [Dkt. No. 775], which also raised issues unrelated to the present motion, and which the Court dismissed for a lack of jurisdiction [Dkt. No. 770].

On June 3, 2016, after receiving the appropriate authorization from the Fourth Circuit to file a second or successive 28 U.S.C. § 2255 motion [Dkt. No. 841], Royer filed the present Motion to Vacate, in which he argues that his conviction under § 924(c) should be vacated because the definition of crime of violence on which it relied is unconstitutionally vague in light of Johnson v. United States, 135 S. Ct. 2551 (2015). On December 12, 2016, Royer was released from the custody of the Bureau of Prisons; however, because Royer was still subject to supervision, he informed the Court after his release that he wished to continue with the Motion to Vacate. [Dkt. No. 875]. On April 14, 2017, the Court stayed the Motion to Vacate pending the Supreme Court's decision in Sessions v. Dimaya, 138 S. Ct. 1204 (2018). [Dkt. No. 877]. On April 17, 2018, the Supreme Court released its decision in Dimaya and, two days later, the Court unstayed the Motion to Vacate and set a briefing schedule. [Dkt. No. 882]. The Motion to Vacate has now been fully briefed and the Court finds that oral argument would not aid the decisional process.

## B. Legal Background

Under 18 U.S.C. § 924(c):

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
> (i) be sentenced to a term of imprisonment of not less than 5 years;

5

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A). Section 924(c) also provides a definition of the term "crime of violence" for purposes of that section:

[T]he term "crime of violence" means an offense that is a felony and—
(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). The two prongs of this definition are commonly referred to as the "force clause" and the "residual clause" respectively. This provision is not the only place in the United States code where a similar definition appears. Using nearly identical language, 18 U.S.C. § 16 provides:

The term "crime of violence" means—
(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.[3] Similarly, 18 U.S.C. § 924(e)[4] defines the term "violent felony" as

any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive

---

[3] Section 16 does not itself criminalize any conduct or prescribe any enhanced punishments related to crimes of violence. Instead, § 16 provides a generic definition of "crime of violence" that is incorporated into various other provisions of the United States code. See, e.g., 8 U.S.C. § 1101(a)(43) (defining "aggravated felony" for the purposes of immigration removal to include any "crime of violence (as defined in [§ 16], but not including a purely political offense) for which the term of imprisonment [sic] at least one year"); 18 U.S.C. § 25 (incorporating § 16 in criminalizing the use of a minor to commit a "crime of violence").

[4] Section 924(e), which is referred to as the Armed Career Criminal Act ("ACCA"), provides for a mandatory minimum sentence of fifteen years imprisonment for any individual who is convicted of unlawful possession of a firearm in violation of 18 U.S.C. § 922(g) and who has three previous convictions for violent felonies and/or serious drug offenses.

device that would be punishable by imprisonment for such term if committed by an adult, that—

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).

The current Motion to Vacate rests on two Supreme Court cases respectively addressing § 924(e) and § 16: Johnson v. United States, 135 S. Ct. 2551 (2015), and Sessions v. Dimaya, 138 S. Ct. 1204 (2018). In Johnson, the Supreme Court considered a due process vagueness challenge to the portion of § 924(e) defining a violent felony as a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another" (the "ACCA residual clause"). See Johnson, 135 S. Ct. at 2555. Although the Supreme Court had previously decided four different cases each involving the application of the ACCA residual clause to a specific state crime and had "rejected suggestions by dissenting Justices" in two of those cases that the ACCA residual clause violated "the Constitution's prohibition of vague criminal laws," id. at 2556, the Johnson Court reversed course, holding that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges" and that increasing "a defendant's sentence under the clause denies due process of law," id. at 2557.

As the Supreme Court explained, the ACCA residual clause required courts to use a framework known as the ordinary-case approach when determining whether a previous conviction of a particular state or federal crime qualified as a conviction of a violent felony. Under this framework, courts were required "to picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents a serious potential risk of physical injury." Id. (internal quotation marks omitted). In determining that the ACCA

7

residual clause was unconstitutionally vague, the Court specifically described problems generated by four aspects of this inquiry.

First, the Court observed that the ACCA residual clause "leaves grave uncertainty about how to estimate the risk posed by a crime" because "assessing 'potential risk' seemingly requires the judge to imagine how the idealized ordinary case of the crime subsequently plays out" but the statute provides no guidance on how to determine what the "ordinary case" of a given crime includes. Id. at 2557-58. As examples, the Court explained that it is unclear whether the ordinary case of witness tampering involves offering a witness a bribe or threatening a witness with violence or whether the ordinary case of attempted burglary involves a would-be burglar being confronted by a police officer, security guard, or homeowner or simply a homeowner "yelling 'Who's there?' from his window, and the burglar's running away." Id. (internal quotation marks omitted). The Court further explained that the statute provided no guidance on how to determine which of various potential alternatives represents the ordinary case: "A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?" Id. at 2557 (internal quotation marks omitted).

Second, the Court observed that the ACCA residual clause left "uncertainty about how much risk it takes" for this ill-defined "ordinary case" of a crime "to qualify as a violent felony." Id. at 2558. The indeterminacy of this risk threshold was heightened by the provision's structure, which "force[d] courts to interpret 'serious potential risk' in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives," which themselves are "far from clear in respect to the degree of risk each poses." Id. (internal quotation marks omitted).

Third, the Court observed that the ACCA residual clause did not limit the inquiry to risks posed by even the stylized ordinary defendant's conduct in the commission of the offense but instead forced courts to consider how the aftermath of the ordinary offense might play out. As the Court explained, "the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone" because the risk of injury in such cases "arises because the extortionist might engage in violence after making his demand or because the burglar might confront a resident in the home after breaking and entering." Id. at 2557. This lack of a nexus requirement or temporal limitation only heightened the uncertainty involved in evaluating the risks posed by any given offense.

Lastly, the Court surveyed previous decisions attempting to apply the ACCA residual clause and found that the Supreme Court's "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy." Id. at 2558. For example, in each of the three cases where the Supreme Court had "concentrated on the level of risk posed by the crime in question," the Court had "found it necessary to resort to a different ad hoc test to guide [its] inquiry." Id. These tests included asking whether the risk posed by the crime in question was "comparable" to the risk posed by the closest analog among the enumerated offenses, using a statistical report prepared by the Sentencing Commission to analyze the level of risk posed by the crime in question, and relying on a combination of "common sense" and statistical evidence to assess the degree of risk posed by the crime. Id. at 2558-59. In the fourth Supreme Court case applying the residual clause, the Court had taken "an entirely different approach," asking whether the crime in question resembled the enumerated offenses "in kind," rather than in "degree[,] of risk posed." Id. at 2559 (internal quotation marks

9

omitted). Moreover, looking beyond its own cases, the Supreme Court acknowledged that the ACCA residual clause had created "numerous splits among the lower federal courts" both about "whether the residual clause covers this or that crime" and about "the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider." Id. at 2560 (internal quotation marks omitted). Taking these factors together, the Supreme Court concluded that the ACCA residual clause was unconstitutionally vague.

In the wake of this decision, the lower federal courts began to split over whether the nearly identical residual clauses in § 16 and § 924(c), both of which shared some—but not all—of the features of the ACCA residual clause at issue in Johnson, were also unconstitutionally vague. In Dimaya, the Supreme Court resolved this split with respect to § 16, holding that § 16(b) "suffers from the same constitutional defect" identified in Johnson. Dimaya, 138 S. Ct. at 1210.

In particular, the Dimaya Court read Johnson as relying on two specific features of the ACCA residual clause to find it unconstitutionally vague: "'By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause' violates the guarantees of due process." Id. at 1214 (quoting Johnson, 135 S. Ct. at 2558). According to the Court, § 16(b) "has the same two features . . . , combined in the same constitutionally problematic way." Id. at 1213. First, as with the ACCA residual clause, § 16(b) calls for an ordinary-case analysis and, because the "ordinary case" of a given crime remains an "inscrutable thing," § 16(b) does not provide a clear way to measure the risk posed by a given crime. Second, as with the ACCA residual clause, § 16(b) employs an uncertain risk threshold ("substantial risk") that, when applied to "an

10

idealized ordinary case of the crime[,] . . . ceases to work in a way consistent with due process." Id. at 1215-16 (internal quotation marks omitted).

Accordingly, the Dimaya Court held that § 16(b) was unconstitutionally vague, and, armed with these two decisions, Royer now contends that § 924(c)(3)(B), which is worded almost identically to § 16(b), is also unconstitutionally vague.

## II. DISCUSSION

The government argues that consideration of the Motion to Vacate is barred by a variety of procedural obstacles, and also fails on the merits because § 924(c)(3)(B) should be reinterpreted in accordance with principles of constitutional avoidance rather than struck down. Lastly, it argues that under its interpretation of § 924(c), Royer's predicate offense remains a crime of violence, and therefore his Motion to Vacate should be dismissed. The Court will address each argument in turn.

### A. Timeliness Under 28 U.S.C. § 2255(f)

The government first argues that the Motion to Vacate is untimely. In general, for a motion under § 2255 to be timely, it must be filed within one year of the date that the movant's conviction became final; however, "courts will consider a [§ 2255] motion timely if (1) [the movant] relies on a right recognized by the Supreme Court after his judgment became final, (2) he files a motion within one year from 'the date on which the right asserted was initially recognized by the Supreme Court,'" and (3) the right has been made retroactively applicable. United States v. Brown, 868 F.3d 297, 301 (4th Cir. 2017) (quoting 28 U.S.C. § 2255(f)). Because there is no question that movant's motion was filed more than one year after Royer's conviction became final, the motion is timely only if he is asserting a right that has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral

review. According to the government, the motion is untimely under this provision because it is based on a "right regarding the constitutionality of § 924(c)(3)(B)" that has not yet been recognized by the Supreme Court. This argument is unpersuasive.

In Brown, the Fourth Circuit recently explored the question of what it means for a § 2255 motion to rely on a right recognized by the Supreme Court. There, the movant argued that his sentence, which was imposed pursuant to the then-mandatory Sentencing Guidelines, was unconstitutional because the relevant guideline range had been enhanced by Brown's designation as a career offender under a provision similar to the ACCA residual clause that was invalidated in Johnson. To support his argument, the movant "urge[d] th[e] court to cobble together a right by combining Johnson's reasoning with that of two other Supreme Court cases," United States v. Booker, 543 U.S. 220 (2005), which "recognized a constitutional distinction between mandatory Sentencing Guidelines and advisory Sentencing Guidelines," and Beckles v. United States, 137 S. Ct. 886 (2017), which held that the advisory Sentencing Guidelines are not subject to vagueness challenges but, in so doing, "carefully limited its holding to the advisory Sentencing Guidelines, thus, in [Brown's] view, leaving open the question of whether defendants could challenge sentences imposed under the mandatory Sentencing Guidelines as void for vagueness." Id. at 302 (emphasis in original). Combining the premise from Booker, the reasoning from Johnson, and the explicit limitation in Beckles, Brown argued "that the mandatory Sentencing Guidelines cabined a sentencing judge's discretion in a manner that raises the same concerns animating the Supreme Court's decision in Johnson: denying fair notice to defendants and inviting arbitrary enforcement by judges." Id.

The Fourth Circuit rejected Brown's argument and held that he did not appropriately assert a new right that had been recognized by the Supreme Court. According to the court's

majority opinion, "a Supreme Court case has 'recognized' an asserted right within the meaning of § 2255(f)(3) if it has formally acknowledged that right in a definite way." Id. at 301. On the other hand, "if the existence of a right remains an open question as a matter of Supreme Court precedent, then the Supreme Court has not 'recognized' that right." Id. The court concluded that Brown had not shown that Johnson had recognized the right in question for two reasons. First, as Brown himself had conceded, the Beckles Court "carefully crafted its holding to avoid deciding whether the logic of Johnson applied outside the context of [the] ACCA," which "confirm[ed] that the Supreme Court has yet to recognize a broad right invalidating all residual clauses as void for vagueness simply because they exhibit wording similar to ACCA's residual clause." Id. at 302. Second, Beckles had left open "the question of whether defendants could challenge sentences imposed under the mandatory Sentencing Guidelines as void for vagueness," which meant that the Supreme Court had explicitly refused to recognize the right asserted by Brown in Beckles. Id. Accordingly, the majority held that Brown's motion was untimely under § 2255(f)(3) in light of "the narrow nature of Johnson's binding holding," as well as "Beckles's indication that the position advanced by [Brown] remains an open question in the Supreme Court." Id. at 303.[5]

The government argues that similar logic applies to the Motion to Vacate because "[n]either the plurality opinion in Dimaya nor Justice Gorsuch's concurrence said anything about

_____

[5] In dissent, Chief Judge Gregory explained that, in his view, "a newly recognized right is more sensibly read to including the reasoning and principles to explain it" and Johnson "recognized a defendant's right not to have his or her sentence fixed by the application of the categorical approach to an imprecise and indeterminate sentencing provision." See Brown, 868 F.3d at 304 (Gregory, C.J., dissenting). Based on the combination of his more flexible reading of § 2255(f)(3) and his more abstract interpretation of Johnson, he would have found that Brown was asserting a right recognized in Johnson and would have allowed the claim to proceed.

13

§ 924(c)." Gov't Mem. 8. Indeed, the only mention of § 924(c) in <u>Dimaya</u> came in Chief Justice Roberts's dissent, which recognized that:

> § 16 serves as the universal definition of "crime of violence" for all of Title 18 of the United States Code. Its language is incorporated into many procedural and substantive provisions of criminal law, including provisions concerning racketeering, money laundering, domestic violence, using a child to commit a violent crime, and distributing information about the making or use of explosives. See 18 U.S.C. §§ 25(a)(1), 842(p)(2), 1952(a), 1956(c)(7)(B)(ii), 1959(a)(4), 2261(a), 3561(b). Of special concern, § 16 is replicated in the definition of "crime of violence" applicable to § 924(c), which prohibits using or carrying a firearm "during and in relation to any crime of violence," or possessing a firearm "in furtherance of any such crime." §§ 924(c)(1)(A), (c)(3). Though I express no view on whether § 924(c) can be distinguished from the provision we consider here, the Court's holding calls into question convictions under what the Government warns us is an "oft-prosecuted offense."

<u>Dimaya</u>, 138 S. Ct. at 1241 (Roberts, C.J., dissenting). Moreover, the government observes that <u>Dimaya</u> did not hold that language like that in § 16(b) and § 924(c)(3)(B) requires a categorical approach rather than a conduct-specific approach and argues that § 924(c)(3)(B) is distinguishable from § 16(b) because, as is discussed below, "the government now contends that the better reading of § 924(c)(3)(B) is under a conduct-specific" approach. Gov't Mem. 8. Accordingly, the government argues that "<u>Dimaya</u> does not, by itself, entitle Royer to relief" and that any "reliance on <u>Dimaya</u> in this context would have to turn on the purported similarity between § 924(c)(3)(B) and § 16(b)," which analogical reasoning is "foreclose[d]" by <u>Brown</u>. Gov't Mem. 8.[6]

---

[6] The government also argues that the Motion to Vacate is not timely if "reasonable jurists" may disagree about the appropriate resolution of the motion. Gov't Mem. 9 (citing <u>Chaidez v. United States</u>, 568 U.S. 342, 347 (2013)). This argument begins with the correct premise that determining whether a particular Supreme Court case recognizes a "new" right involves applying the framework developed by the Supreme Court in <u>Teague v. Lane</u>, 489 U.S. 288, 301 (1989), which holds that "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." <u>See</u> <u>United States v. Powell</u>, 691 F.3d 554, 557-58 (4th Cir. 2012). Without any intermediate steps, it ends in the incorrect conclusion that the movant's motion is not timely if the result is not "dictated" by <u>Dimaya</u> or <u>Johnson</u>.

To the contrary, under the logic of Brown, Royer's motion is timely. The Brown decision was premised on the unique circumstances of that case, in which the movant attempted to rely on the confluence of three Supreme Court cases, one of which had explicitly left open the question his petition presented. Unlike Brown's § 2255 motion, Royer's motion relies on a simple application of the rule announced in Dimaya to the nearly identical provision in § 924(c), which the Fourth Circuit has traditionally interpreted in tandem with § 16(b). See In re Hubbard, 825 F.3d 225, 230 n.3 (4th Cir. 2016) ("We note, however, that the language of § 16(b) is identical to that in § 924(c)(3)(B), and we have previously treated precedent respecting one as controlling analysis of the other.").

Moreover, when Brown was decided, the Fourth Circuit interpreted Johnson as a "narrow" decision that applied only to the context of the ACCA and not to other residual clauses. See Brown, 868 F.3d at 302-03. By contrast, Dimaya makes clear that its holding is not so restricted but instead applies to invalidate any provision that possesses "an ordinary-case requirement and an ill-defined risk threshold." See Dimaya, 138 S. Ct. at 1223. The Dimaya Court's repeated references to these two features, and its holding that "minor linguistic disparities" between statutes that share these features do not "make[] any real difference," id., clearly and formally recognize a due process right not to be deprived of one's life, liberty, or

_____

To understand where the slippage in this argument occurs requires breaking down the inquiry under § 2255(f)(3). The plain language of this provision requires the Court to determine both whether the Supreme Court case in question "initially recognized" a right and also whether the movant "assert[s]" this right. The government's argument improperly mixes these two inquiries because the premise refers to the first inquiry and the conclusion to the second. Although the Teague framework is appropriately applied to determine whether a particular case "newly" recognizes a given right or merely applies a right that was recognized in an earlier case, it is not the appropriate test for determining whether a given § 2255 motion is asserting a particular right. To put this in concrete terms, the Teague framework would be used to determine whether Dimaya recognizes a new right (if the government had argued that it does not). It should not be applied to determine whether movant's § 2255 motion relies on the right recognized in Dimaya.

property (whether through conviction, sentencing, deportation, or otherwise) pursuant to any provision that includes these features. Royer asserts that the residual clause of § 924(c), under which he was convicted, is unconstitutionally vague because it includes both an ordinary-case requirement and an ill-defined risk threshold. Accordingly, the Motion to Vacate asserts a right under Dimaya and is timely under § 2255(f)(3).

Furthermore, contrary to what the government appears to argue, the Motion to Vacate is not rendered untimely merely because the government has a reasonable argument that, as a matter of constitutional avoidance, § 924(c) should be reinterpreted to dispense with the ordinary-case requirement[7] and the motion should be denied on the merits. As the Seventh Circuit has explained, although with respect to a different provision, the "government's approach suffers from a fundamental flaw" because it "improperly reads a merits analysis into the limitations period." Cross v. United States, 892 F.3d 288, 293 (7th Cir. 2018).The plain language of § 2255(f)(3) provides only that a movant must assert, or "claim the benefit of," a newly recognized right; however, under the government's framing of the inquiry, § 2255(f)(3) would only apply if the Supreme Court had directly held that the provision at issue was unconstitutional. Id. at 293-94. This would improperly change § 2255(f)(3) from requiring the movant to "assert" a right under a given case to requiring, as a threshold matter, "that the movant must ultimately prove that the right applies to his situation." Id. at 294; see also United States v. Meza, No. CR 11-133, 2018 WL 2048899, at *6 (D. Mont. May 2, 2018), appeal filed, No. 18-35478 (9th Cir.) ("[T]he [government's] argument needlessly entangles the question of when to

---

[7] Indeed, the government's substantive argument that § 924(c) should be reinterpreted as a matter of constitutional avoidance highlights that Royer's motion is not premature because that argument is an implicit concession that, in light of Dimaya, there are serious constitutional questions about whether § 924(c)(3)(B) is impermissibly vague, at least as it has traditionally been interpreted.

file with the decision as to whether the movant actually has the right he asserts. And to what end? If the filing is timely, it is meritorious. If it lacks merit, it is untimely. This leaves the limitations period with no work to do. Statutes of limitation are not generally redundant with the merits of a claim in this way.").

In addition, the problematic consequences that would flow from accepting the government's argument are highlighted by the portion of Chief Justice Roberts's dissent that is quoted above, which explains that "the language of § 16(b) is incorporated or repeated in numerous places in the U.S. Code." Meza, 2018 WL 2048899, at *5. The government's argument would seem to require that the Supreme Court decide a case applying the Johnson/Dimaya rule to each of these statutory provisions before a defendant convicted under that provision may file a § 2255 motion. See id. This result would untenably impair judicial economy and leave many federal prisoners convicted under potentially unconstitutional provisions languishing in prison with no meaningful opportunity to contest their convictions. Not only is such a result fundamentally unfair, it does not comport with the purpose of the § 2255(f) limitations scheme. Congress "intended the statute of limitations 'to eliminate delays in the federal habeas review process,' not to create them." Id. (citation omitted) (quoting Holland v. Florida, 560 U.S. 631, 648 (2010)).

Lastly, this determination is in accord with many of the federal district courts that have addressed § 2255 motions presenting vagueness challenges to § 924(c) convictions in light of Dimaya, including some courts that have denied the motion despite allowing it to proceed under § 2255(f)(3). See, e.g., United States v. Brown, Crim. No. 11-15-2, 2018 WL 2171450 (W.D. La. May 10, 2018); Meza, 2018 WL 2048899; United States v. Flores, No. 2:08-cr-163, 2018 WL 2709855 (D. Nev. June 5, 2018); Russaw v. United States, No. 2:15-cv-8146, 2018 WL 2337301

17

(N.D. Ala. May 23, 2018); United States v. Lal, No. 2:12-cr-193, 2018 WL 2222720 (D. Nev. May 15, 2018); Otero v. United States, No. 10-cr-743, 2018 WL 2224990 (E.D.N.Y. May 15, 2018).

Accordingly, Royer's motion, which was filed within one year of both Johnson and Dimaya, is timely under § 2255(f)(3).

### B. **Procedural Default**

The government next argues that Royer procedurally defaulted his vagueness challenge because he did not raise it at sentencing or on direct appeal; however, a procedural default may be excused where a movant can establish that he is "actually innocent" or can show "cause" for the default and "prejudice resulting therefrom." United States v. Fugit, 703 F.3d 248, 253 (4th Cir. 2012). Because Royer meets both of these criteria, any procedural default will be excused.[8]

As an initial matter, Royer's claim asserts that he is actually innocent with respect to the § 924(c) charge. In United States v. Adams, 814 F.3d 178 (4th Cir. 2016), the Fourth Circuit recently explored the contours of such a claim. In that case, the defendant had pleaded guilty to possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). Id. at 182. After Adams's conviction became final, Fourth Circuit law changed such that none of Adams's prior

---

[8] The government does not clearly frame this argument in terms of procedural default, instead arguing simply that "to obtain relief now, Royer would have to show that he was actually innocent of" the charges dismissed by the government in exchange for his guilty plea. See Gov't Mem. 10-14. That being said, the government does not cite to any authority establishing a general rule that a movant may never prevail on a § 2255 motion unless he can show that he was actually innocent of any charges dismissed by the government in exchange for a guilty plea, and a review of the government's position and the cited case law makes clear that the government is attempting to invoke the procedural default doctrine. See id. at 10 ("[O]n collateral review, claims that were not raised on appeal are deemed waived, and procedural default operates to bar such claims, unless the movant can establish cause and prejudice or, in the alternative, actual innocence. . . . [T]he showing of actual innocence ha[s] to reach not only the charge to which Royer pled guilty, but also the charges that were dropped as part of his plea bargain . . . ." (internal quotation marks omitted)).

18

convictions counted as a felony for purposes of § 922(g). Id. at 181. Adams filed a § 2255

motion seeking to vacate his § 922(g) conviction, and the Fourth Circuit held that the motion fell

outside the scope of Adams's appellate waiver because his claim was one of actual innocence:

that "he was not, in fact, a convicted felon when he possessed the firearm." Id. at 184. Similarly

here, Royer is claiming actual innocence. Section 924(c) criminalizes using or carrying a firearm

during and in relation to a crime of violence or possessing a firearm in furtherance of a crime of

violence, and Royer's argument is that when his co-defendants used, carried, or possessed

firearms, they were not, in fact, committing a crime of violence. Therefore, Royer has

appropriately presented a claim of actual innocence.

The government contends that, to overcome the procedural default, Royer's showing of

actual innocence must extend to the predicate offense, not just to the § 924(c) offense. Gov't

Mem. 10. This argument is based on a sentence in Bousley v. United States, 523 U.S. 614, 624

(1998), where the Supreme Court stated: "In cases where the Government has forgone more

serious charges in the course of plea bargaining, petitioner's showing of actual innocence must

also extend to those charges." The Fourth Circuit has since expanded on this statement, holding

that a defendant who pleads guilty need not make a showing of actual innocence with respect to

all of the charges that the government dismissed or chose not to file as a result of the plea

bargain but instead must only show that he is factually innocent with respect to the "underlying

criminal conduct" to which he pleaded guilty. Adams, 814 F.3d at 184.[9] For example, when a

defendant is initially charged with armed robbery and pleads guilty to the lesser charge of

---

[9] The Court recognizes that, in adjudicating Royer's previous § 2255 motion and habeas petition, it had suggested that Royer's claims of actual innocence would be barred by the Bousley rule; however, Adams, which was decided by the Fourth Circuit after the Court ruled on Royer's previous filings, represents a significant reinterpretation of the Bousley rule such that it no longer applies to Royer's situation.

common law robbery, he must show actual innocence with respect to both the armed robbery and the common law robbery. Id. (citing Lyons v. Lee, 316 F.3d 528, 533 n.5 (4th Cir. 2003)). Similarly, if "a defendant who is charged with second-degree murder, a homicide crime, . . . later negotiates a plea bargain whereby he pleads guilty to voluntary manslaughter," he "must show that he is factually innocent of the second-degree murder charge as well as the voluntary manslaughter charge to which he pleaded guilty." Id. With respect to these examples, the Fourth Circuit has further explained that the "underlying criminal conduct" is "robbery" in the first and "homicide" in the second. Id. As these examples clarify, the Fourth Circuit appears to have read the Bousley rule to apply where a defendant agrees to plead guilty in exchange for the government's filing of a less serious charge—particularly a lesser-included offense—rather than a more serious charge covering the same conduct. In such a situation, the Bousley rule serves an important purpose by ensuring that a defendant who is innocent of the lesser charge but guilty of the more serious charge does not receive an unearned windfall, particularly where the statute of limitations may have run out on the more serious charge in the interim.

In this case, the Bousley rule does not require Royer to show that he is also innocent of the various charges in the superseding indictment that were dismissed. The § 924(c) conviction which Royer is currently challenging covers only the relatively narrow conduct of aiding and abetting various co-defendants' using and discharging firearms at the LET camps by helping those co-defendants gain entry to the camps. By contrast, the charges in the superseding indictment which were dismissed and which the government contends are more serious than the § 924(c) charge involve conspiracies to levy war against the United States, contribute material support to LET and al-Qaeda, and provide support to the Taliban, all of which involve significantly more broad-ranging conduct than the relatively narrow § 924(c) offense. Cf. United

States v. Khan, 309 F. Supp. 2d 789 (E.D. Va. 2004), aff'd in part, remanded for sentencing, 461 F.3d 477 (4th Cir. 2006) (explaining the factual background related to the charged conspiracies). Accordingly, unlike the situations that the Fourth Circuit described in Adams, the § 924(c) charge is not a lesser-included offense of the charges that were dismissed and, instead, the dismissed charges involved substantially more conduct than the § 924(c) charge to which Royer pleaded guilty. Therefore, the § 924(c) charge and the dismissed charges are not so interrelated as to trigger application of the Bousley rule, which means that Royer has shown that he is actually innocent with respect to the narrow criminal conduct underlying the § 924(c) conviction.

In addition, it is not at all obvious that the § 924(c) charge is less serious than the charges that were dismissed, particularly given the other charge to which Royer pleaded guilty. Both the § 924(c) charge and the § 844(h) charge carried mandatory minimum sentences of 10 years, which had to run consecutively to each other, and the § 924(c) charge carried a statutory maximum sentence of life imprisonment. By contrast, the four charges which the government contends were more serious charges each carried a statutory maximum sentence of either fifteen or twenty years imprisonment, and none of the charges carried a statutory mandatory minimum sentence or a requirement that the sentence imposed run consecutively to any other sentence. See 18 U.S.C. §§ 2339A, 2339B, 2384; 50 U.S.C. § 1705. Accordingly, by pleading guilty to violations of § 924(c) and § 844(h), Royer was subject to a mandatory minimum sentence of twenty years imprisonment and a maximum sentence of life imprisonment, whereas each of the individual charges which the government contends were more serious would have exposed Royer to between zero and twenty years imprisonment. Although the government may be correct that the sentencing guideline range for these convictions would have been in excess of twenty years, the Court would not have been required to impose such lengthy sentences. Therefore, if

21

Royer is actually innocent of the § 924(c) charge, it would be fundamentally unfair to refuse to vacate his sentence on that charge, even if he is not innocent of the other charges in the superseding indictment.[10]

Even if Royer were not claiming actual innocence, any procedural default would still be excused based on the cause-and-prejudice prong.[11] Cause for default is established when "a constitutional claim is so novel that its legal basis [wa]s not reasonably available to counsel" at the time of the default. Reed v. Ross, 468 U.S. 1, 16 (1984). For example, although not an exhaustive list, where a Supreme Court decision "explicitly overrule[s] one of [the Court's] precedents" or "overturn[s] a longstanding and widespread practice to which th[e Supreme] Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved," there "will almost certainly have been no reasonable basis upon which an attorney previously could have urged a [lower] court to adopt the position that th[e Supreme] Court has ultimately adopted." Id. at 17 (internal quotation marks and alteration omitted).

Royer meets this standard. Before Johnson, the Supreme Court had twice stated that the ACCA residual clause was not unconstitutionally vague, and every circuit court to consider the

---

[10] Although the government cites authority from some circuits for the proposition that the guideline range is the appropriate measure of seriousness to use in a Bousley analysis and Royer cites authority from other circuits for the proposition that the statutory maximum is the appropriate measure to use, it appears as if the Fourth Circuit has not yet weighed in on the proper resolution of this question. Because the Court has found that the dismissed charges do not involve the same underlying criminal conduct as the § 924(c) charge and are therefore not properly considered under Adams, there is no need to resolve this disputed issue; however, the Court observes that given the advisory nature of the guidelines, any analysis that focuses entirely on the guideline range without considering the other factors that a court is required to consider in imposing a sentence would appear incomplete.

[11] Royer has not made an argument based on the cause-and-prejudice test for excusing procedural default; however, given the inelegant way in which the government framed its procedural default argument, as well as the natural deference due criminal defendants, the Court will consider whether he meets the prong.

question had upheld the ACCA residual clause against constitutional vagueness attack.[12] See

Sykes v. United States, 564 U.S. 1, 33 (2011) ("The residual clause . . . states an intelligible

principle and provides guidance that allows a person to conform his or her conduct to the law."

(internal quotation marks omitted)); James v. United States, 550 U.S. 192, 210 n.6 (2007) ("We

are not persuaded by Justice SCALIA's suggestion—which was not pressed by James or his

amici—that the residual provision is unconstitutionally vague."); see also, e.g., United States v.

Hart, 674 F.3d 33, 41 n.3 (1st Cir. 2012); Harrington v. United States, 689 F.3d 124, 137 & n.9

(2d Cir. 2012); United States v. Blair, 734 F.3d 218, 223 n.5 (3d Cir. 2013); United States v.

Hudson, 673 F.3d 263, 268-69 (4th Cir. 2012); United States v. Gore, 636 F.3d 728, 742 (5th

Cir. 2011); United States v. Phillips, 752 F.3d 1047, 1051-52 (6th Cir. 2014); United States v.

Jones, 689 F.3d 696, 704-05 (7th Cir. 2012); United States v. Brown, 734 F.3d 824, 827 (8th Cir.

2013); United States v. Spencer, 724 F.3d 1133, 1145-46 (9th Cir. 2013); United States v. Orona,

724 F.3d 1297, 1310-11 (10th Cir. 2013); United States v. Weeks, 711 F.3d 1255, 1262 (11th

Cir. 2013). Indeed, the government does not cite a single opinion, from any court, that held that

the ACCA residual clause, the § 16(b) residual clause, the § 924(c) residual clause, or any other

similar provision was unconstitutionally vague before Johnson.

Although "futility cannot constitute cause if it means simply that a claim was

unacceptable to that particular court at that particular time," Bousley, 523 U.S. at 623 (internal

quotation marks omitted), these cases demonstrate that the landscape before Johnson meets the

standard described in Reed. Rather than the claim in question simply being unacceptable to this

Court or to the Fourth Circuit, the Supreme Court had expressly held multiple times that the

ACCA residual clause was not unconstitutionally vague, and a unanimous body of lower-court

---

[12] The Court is aware of no circuit court cases before Johnson where § 924(c)(3)(B) was even
challenged as unconstitutionally vague.

precedent had similarly rejected vagueness claims. Cf. Bousley, 523 U.S. at 622 (explaining that the claim in question was "surely not a novel one" because "at the time of petitioner's [guilty] plea, the Federal Reporters were replete with cases involving challenges" like the one petitioner had defaulted). Against this backdrop, the Supreme Court's Johnson decision was a "bolt of lightning from the clear blue sky," United States v. Grogans, No. 7:11-cr-21, 2017 WL 946312, at *5 (W.D. Va. Mar. 9, 2017) (holding that Grogans's failure to bring a vagueness challenge to the ACCA residual clause before Johnson was excused under the cause-and-prejudice prong because the claim "was so novel that it was not reasonably available to counsel"), and Royer has established sufficient cause to excuse any default.

In addition to cause, Royer must show actual prejudice resulting from the default, which requires establishing a "reasonable probability" that, without the claimed error, the result of the underlying proceedings would have been different. For the reasons discussed in this Memorandum Opinion, the predicate offense underlying Royer's § 924(c) conviction is not a crime of violence either under the force clause or under the conduct-specific approach to the residual clause that constitutional avoidance principles require the Court to adopt, therefore any procedural default is excused because he has clearly shown prejudice and has met both the actual innocence and the cause-and-prejudice prongs of the test described in Fugit.

## C. Analysis Under § 924(c)(3)(A)

The government next argues that Royer's § 924(c) conviction should not be vacated because the predicate crime—conspiracy to commit an offense against the United States— qualifies as a crime of violence under the force clause, § 924(c)(3)(A), the constitutionality of which is not called into question by Johnson or Dimaya. Under the force clause, any felony offense that "has as an element the use, attempted use, or threatened use of physical force against

the person or property of another" is a "crime of violence." According to the government, Royer's predicate offense falls under this clause because "[o]ne definition of 'threaten' is 'to give signs or warning of,' or 'to portend,'" and when two or more people engage in and when two or more people engage in a conspiracy to commit an offense against the United States, "that agreement, without more, 'portends' the use of force, because the existence of the conspiracy makes the occurrence of the conspiracy's object far more likely." Gov't Mem. 16. This argument is unpersuasive.

As is obvious from the plain language of the force clause, analyzing whether a particular offense falls within its ambit requires the Court to focus on "the statutory definition of the offense." United States v. Fuertes, 804 F.3d 485, 498 (4th Cir. 2015) (internal quotation marks and alterations omitted). In particular, the Court must examine the "element[s]" of the claimed predicate offense and determine whether any element necessarily involves "the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The elements of a conspiracy under 18 U.S.C. § 371 "are 1) an agreement by two or more persons to perform some illegal act, 2) willing participation by the defendant, and 3) an overt act in furtherance of the conspiracy." Khan, 309 F. Supp. 2d at 818.

Merely reading the elements of the claimed predicate offense is sufficient to demonstrate that it is not covered by the force clause because it does not require, as an element, that a violator of the statute use force, attempt to use force, or threaten to use force. The government's argument that a violation of each statute necessarily involves the "threatened" use of force because such a conspiracy "portends" the future use of force by making such a use "more likely" does not alter this straightforward analysis for three reasons. First, although one way to define "to threaten" may be "to portend" (e.g., "the clouds threatened rain"), see "Threaten," American

Heritage College Dictionary (3d ed. 2000), it is clear from the context of § 924(c)(3)(A) that this is not the sense in which Congress used the word in the force clause. Instead, a "threatened" use of force involves a situation where a defendant's "conduct and words were calculated to create the impression" that the defendant may imminently use force. United States v. Jones, 932 F.2d 624, 625 (7th Cir. 1997) (cited in United States v. McNeal, 818 F.3d 141, 153 (4th Cir. 2016)); see also "Threat," Black's Law Dictionary (8th ed. 2004) (defining a "threat" as a "communicated intent to inflict harm or loss on another"). The claimed predicate offense here clearly does not have as an element any such "threatened use" of force. Second, the government's interpretation of "threaten" raises its own constitutional problems. As the Supreme Court explained in Johnson, one of the predominant features of the ACCA residual clause that gave rise to its unconstitutional indeterminacy was that it did not limit the risk-of-force analysis to the conduct surrounding the elements of the crime but instead required courts to "imagine" how a stylized version "of the crime subsequently plays out." Johnson, 135 S. Ct. at 2557-58. The government's proposed definition of "threaten" falls into the same trap, asking the Court to determine whether a violation of the predicate offense necessarily leads to a sequence of events that "portends" the use of force at some indeterminate point in the future. As Johnson made clear, the Court must reject such an invitation. Third, even if the government's definitions of "threaten" and "portend" were correct, the inchoate nature of the conspiracy offenses at issue here would still not necessarily "portend" the use of force by the defendant. Because no more than an agreement to engage in the relevant conduct and the commission of a single overt act is required to establish a violation of the predicate offense, even if the defendant does not pursue the agreement any further, it is possible for a defendant to commit the predicate offense without in any way "portending" the future use of force.

Accordingly, it is clear that § 371, the claimed predicate offense, involved in this case does not have "as an element the use, attempted use, or threatened use of physical force against the person or property of another," 18 U.S.C. § 924(c)(3)(A), and therefore it does not qualify as a crime of violence under the force clause.

### D. Analysis Under § 924(c)(3)(B)

As previously discussed, § 924(c)(3)(B), the residual clause, defines as a crime of violence any "offense that is a felony" and "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." This language has previously been interpreted by both the Fourth Circuit and other courts to require an "ordinary-case" categorical approach, where the relevant question is whether the "ordinary case" of the predicate crime committed by the defendant (e.g., the "ordinary" bank robbery in violation of 18 U.S.C. § 2113(a)) "by its nature" involves a "substantial risk that physical force against the person or property of another may be used in the course of committing the offense." See United States v. Fuertes, 805 F.3d 485 (4th Cir. 2015); see also, e.g., United States v. Acosta, 470 F.3d 132 (2d Cir. 2006) (per curiam); United States v. Williams, 343 F.3d 423 (5th Cir. 2003); Taylor v. United States, 814 F.3d 340 (6th Cir. 2016); United States v. Moore, 38 F.3d 977 (8th Cir. 1994); United States v. Amparo, 68 F.3d 1222 (9th Cir. 1995); United States v. Serafin, 562 F.3d 1105 (10th Cir. 2009); United States v. Maguire, 706 F.3d 1333 (11th Cir. 2013); United States v. Kennedy, 133 F.3d 53 (D.C. Cir. 1998).

This ordinary case approach was also used in evaluating whether a conviction was encompassed by the residual clauses of § 16(b) as incorporated into the INA and § 924(e) before those provisions were declared void for vagueness, and the inherent difficulty in determining the contours of the "ordinary" case of a given crime was a critical factor underlying the Supreme

27

Court's holdings in <u>Johnson</u> and <u>Dimaya</u>. <u>See Johnson</u>, 135 S. Ct. at ("Two features of the residual clause conspire to make it unconstitutionally vague. In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime . . . . At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony."); <u>Dimaya</u>, 138 S. Ct. at 1223 (concluding that because § 16(b) involved "both an ordinary-case requirement and an ill-defined risk threshold, it necessarily 'devolv[ed] into guesswork and intuition,' invited arbitrary enforcement, and failed to provide fair notice" (alteration in original) (quoting <u>Johnson</u>, 135 S. Ct. at 2557)).

As Royer argues, and as the government appears to recognize, under the rule announced in <u>Dimaya</u>, applying the ordinary-case approach to determine whether a predicate offense is encompassed by § 924(c)(3)(B) produces an unconstitutional result because it involves "both an ordinary-case requirement" and the same "ill-defined risk threshold" as § 16(b), rendering it unconstitutionally vague for precisely the same reasons as the Supreme Court articulated in <u>Dimaya</u>. In view of the "serious constitutional questions" raised about the ordinary-case approach in light of <u>Dimaya</u>, the government urges the Court to "construe Section 924(c)(3)(B) to require that the classification of an offense as a 'crime of violence' under that provision be based on the defendant's actual conduct in that case," and not on the ordinary-case requirement. Gov't Mem. 17. Under this conduct-specific approach, § 924(c)(3)(B) would avoid the vagueness and uncertainty concerns underlying the <u>Johnson</u> and <u>Dimaya</u> decisions.

In general, a court is "obligated to construe [a] statute to avoid" any "serious constitutional problems" as long as "an alternative interpretation of the statute is fairly possible." <u>INS v. St. Cyr</u>, 533 U.S. 289, 299-300 (2001) (internal quotation marks omitted). In this case,

28

there are, as discussed above, serious constitutional problems with § 924(c)(3)(B) if the ordinary-case approach is used to determine whether the predicate offense qualifies as a crime of violence. Accordingly, this Court's task is not to determine whether § 924(c)(3)(B) is better read to incorporate the ordinary-case approach or the conduct-specific approach. Instead, the Court must determine whether it is "fairly possible" to construe § 924(c)(3)(B) as implementing the conduct-specific approach.[13]

Turning to the text of the residual clause, this provision defines a "crime of violence" as any "offense that is a felony" and "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Based on this definition, the critical word to interpret is "offense," and where the government and movant disagree is about whether the word "offense" can fairly be read to refer to the specific criminal act committed by a defendant rather than to the generic crime for which he was convicted.[14] The Supreme Court has already provided at least a preliminary answer to this

_____

[13] Royer argues that interpreting § 924(c)(3)(B) to require a conduct-specific approach is foreclosed by Fourth Circuit precedent, which has applied the ordinary-case approach to § 924(c)(3)(B) in the past. See Mov. Opp. 17-18 (citing United States v. Fuertes, 805 F.3d 485, 498 (4th Cir. 2015); United States v. McNeal, 818 F.3d 141, 152 (4th Cir. 2016); United States v. Aragon, 983 F.2d 1306, 1313 (4th Cir. 1993); and United States v. Naughton, 621 F. App'x 170, 177-78 (4th Cir. 2015)). Although the Fourth Circuit has previously used the ordinary-case approach in applying § 924(c)(3)(B), it did so before Dimaya brought to light the constitutional concerns with such an interpretation. Accordingly, at the most, these Fourth Circuit cases stand for the proposition that the ordinary-case approach was the best interpretation of § 924(c)(3)(B) before Johnson and Dimaya. As discussed above, this Court must determine not what the most natural interpretation of § 924(c)(3)(B) is but instead whether it is "fairly possible" to interpret § 924(c)(3)(B) as employing the conduct-specific approach. St. Cyr, 533 U.S. at 300 (internal quotation marks omitted). Because the inquiry before this Court is materially different than the inquiry engaged in by the Fourth Circuit in Fuertes, McNeal, Aragon, and Naughton these cases do not foreclose the Court from adopting a conduct-specific approach to the residual clause.
[14] The opinions in Dimaya also referenced this debate; however, in that case, the government had not asked the Court to reinterpret § 16(b) as incorporated into the INA to require a conduct-specific approach. See Dimaya, 138 S. Ct. at 1217 (plurality opinion). Accordingly, although Justices Thomas, Kennedy, and Alito, in dissent, argued that the Court should abandon the

29

debate. According to the Court, "in ordinary speech words such as 'crime,' 'felony,' 'offense,' and the like sometimes refer to a generic crime, say, the crime of fraud or theft in general, and sometimes refer to the specific acts in which an offender engaged on a specific occasion, say, the fraud that the defendant planned and executed last month." Nijhawan v. Holder, 557 U.S. 29, 33-34 (2009) (emphasis in original). And, indeed, the Court has at least sometimes interpreted uses of the word "offense" in federal statutes to refer to the specific conduct in which a particular offender engaged. For example, in Nijhawan, the Court interpreted the monetary threshold requirement in 8 U.S.C. § 1101(a)(43)(M)(i), which defines an "aggravated felony" in part as "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000," to apply to "the specific circumstances surrounding an offender's commission of a fraud and deceit crime on a specific occasion" rather than to apply "categorically, i.e., to only those fraud and deceit crimes generically defined to include that threshold." Id. at 40; see also United States v. Hayes, 555 U.S. 415, 426 (2009) (applying a conduct-specific, rather than a

---

ordinary-case approach with respect to § 16(b), see id. at 1252 (Thomas, J., dissenting), a majority of the Court declined to do so, at least in part because the argument had not been presented to the Court, see id. at 1217 (plurality opinion) ("[T]he Government once again has not asked us to abandon the categorical approach in residual-clause cases. To the contrary, and as already noted, the Government has conceded at every step the correctness of that statutory construction." (internal quotation marks omitted)); id. at 1232 (Gorsuch, J., concurring in part and concurring in the judgment) ("I have proceeded on the premise that the Immigration and Nationality Act, as it incorporates § 16(b) of the criminal code, commands courts to determine the risk of violence attending the ordinary case of conviction for a particular crime. I have done so because no party before us has argued for a different way to read these statutes in combination; because our precedent seemingly requires this approach; and because the government itself has conceded (repeatedly) that the law compels it. But any more than that I would not venture." (citations omitted)). In addition, as discussed below, applying the conduct-specific approach in the context at issue in Dimaya would have raised practical and constitutional problems, which further reinforced the majority's view that it would be improper to abandon the ordinary-case approach in that case; however, these same concerns are not present in the context of § 924(c)(3)(B). Accordingly, although the Dimaya opinions discuss the choice between the conduct-specific and ordinary-case approaches to some degree, the tentative conclusions reached on that issue do not squarely answer the question presented here.

categorical, approach to a prong of the definition of "misdemeanor crime of domestic violence" that described "an offense . . . committed by a current or former spouse, parent, or guardian of the victim").

Courts have generally relied on the inclusion of the phrase "by its nature" to interpret § 924(c)(3)(B) and other similar residual clauses as requiring the ordinary-case approach[15]; however, this language does not foreclose the conduct-specific approach. Although the inclusion of the phrase "by its nature" certainly focuses the Court on the inherent characteristics of the "offense" in question, it does nothing to resolve the underlying question of whether the "offense" in question is the generic crime or the specific crime. This conclusion is especially appropriate considering the significant difference between a statute like § 924(c)(3)(B), which criminalizes specific conduct, and statutes such as the ACCA residual clause and § 16(b) as incorporated into the INA, which determine the impact of previous convictions (many of which may involve state law) on later, separate proceedings such as federal sentencing proceedings in <u>Johnson</u> and removal proceedings in <u>Dimaya</u>. Such collateral contexts present the two primary problems that the Supreme Court confronted in interpreting those residual clauses to require the ordinary-case approach. First, these contexts necessarily involved the "utter impracticability" of "accurately reconstructing, often many years later, the conduct underlying a conviction." <u>Dimaya</u>, 138 S. Ct. at 1218 (plurality opinion) (internal quotation marks and alterations omitted); <u>see also</u> <u>Moncrieffe v. Holder</u>, 569 U.S. 184, 200 (2013) ("The categorical approach serves 'practical' purposes: It promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."). Second, the Court observed that the

---

[15] For example, in <u>Dimaya</u>, the plurality opinion explained that "the words 'by its nature' in § 16(b)" make it "all the clearer" that the text, "[b]est read," "demands a categorical approach" because an "offense's 'nature' means its 'normal and characteristic quality.'" <u>Dimaya</u>, 138 S. Ct. at 1217 (plurality opinion) (quoting <u>Webster's Third New International Dictionary</u> 1507 (2002)).

adoption of the categorical approach avoided "the Sixth Amendment concerns that would arise" from courts "making findings of fact that properly belong to juries." Dimaya, 138 S. Ct. at 1217 (plurality opinion) (quoting Descamps v. United States, 570 U.S. 254, 267 (2013)); see also Apprendi v. New Jersey, 530 U.S. 466, 490 (2002) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").[16] Indeed, as Justice Thomas explained, "the categorical approach was never really about the best reading of the text" but was instead adopted "to avoid a potential Sixth Amendment problem with sentencing judges conducting minitrials to determine a defendant's past conduct." Dimaya, 138 S. Ct. at 1256 (Thomas, J., dissenting).

These same concerns do not apply to § 924(c)(3)(B). In "§ 924(c) cases, the predicate offense and the § 924(c) offense are companion contemporaneous crimes, charged in the same indictment before the same federal judge." United States v. St. Hubert, 883 F.3d 1319, 1335 (11th Cir. 2018). Accordingly, in such cases, "the record of all necessary facts are before the federal district court as to both offenses." Id. (internal quotation marks and alteration omitted). Moreover, when a defendant in a § 924(c) case elects to proceed to trial, both the predicate "crime of violence" and the § 924(c) offense are before the fact-finder, which can evaluate the underlying conduct and make a determination about whether that specific conduct involved the use of force or by its nature presented a substantial risk that the defendant would use force against the person or property of another in the course of committing the predicate offense.

---

[16] Although Dimaya involved § 16(b) as incorporated into the INA rather than as incorporated into a criminal statute, the plurality explained that "§ 16(b) is a criminal statute, with criminal sentencing consequences," and that it must be interpreted "consistently," whether it is encountered "in a criminal or noncriminal context." Dimaya, 138 S. Ct. at 1217 (plurality opinion) (internal quotation marks omitted).

Therefore, with respect to § 924(c), there are no practical or constitutional difficulties with rejecting the ordinary-case approach in favor of a conduct-specific approach.

In sum, the text of § 924(c)(3)(B) can be fairly read to support either the ordinary-case or the conduct-specific approach; however, because applying the ordinary-case approach would give rise to the same serious constitutional problems that led the Supreme Court to strike down similar statutes in Johnson and Dimaya, the doctrine of constitutional avoidance compels the Court to reinterpret § 924(c)(3)(B) as adopting the conduct-specific approach. This conclusion is reinforced by the absence of the practical and constitutional problems that concerned the previous courts interpreting the residual clauses in § 924(e) and § 16(b). Accordingly, the Court interprets § 924(c) in relevant part to apply to the use or carrying of a firearm during and in relation to, or the possession of a firearm in furtherance of, the defendant's commission of any federal crime where the defendant's actual conduct, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.[17]

Turning to the question of whether Royer's co-defendants' specific conduct in committing the claimed predicate offenses meets this standard,[18] the government's entire

---

[17] Although Royer does not specifically argue that adopting the conduct-specific approach would not avoid the constitutional problems identified in Dimaya, the Court observes that Dimaya makes clear that such an interpretation has no constitutional infirmity. See Dimaya, 138 S. Ct. at 1215-16 ("[W]e do not doubt the constitutionality of applying § 16(b)'s substantial risk standard to real-world conduct. The difficulty comes, in § 16's residual clause just as in [§ 924(e)'s], from applying such a standard to a judge-imagined abstraction—i.e., an idealized ordinary case of the crime." (internal quotation marks, citations, and alteration omitted)).

[18] The Court recognizes that both the government, in explaining the conduct-specific test, and the Fourth Circuit, in previously interpreting § 924(c)(3)(B), have stated that the relevant inquiry focuses on the conduct of the specific defendant. See Gov't Mem. 28 ("In sum, this Court should construe Section 924(c)(3)(B) to require that the classification of an offense as a 'crime of violence' under that provision be based on the defendant's actual conduct in that case); Fuertes, 805 F.3d at 499 (concluding that the "residual clause makes plain (for all its erstwhile murkiness)

33

argument on this point is: "In this case, Royer pled guilty to violating Section 924(c), and admitted to facts that, based on his actual conduct, constituted crimes of violence. Fourteen years after he pled guilty, and based on his actual conduct, Royer cannot deny his guilt under Section 924(c)." Gov't Mem. 28.

Having reviewed the record, the Court disagrees. Based on the information in the Statement of Facts, Kwon's, Hasan's, Aatique's, and Khan's § 371 violation involved the four men traveling to the LET camps in Pakistan and, while there, discharging various firearms in military training. See PSR ¶ 128; cf. Khan, 309 F. Supp. 2d at 810-11. There is no suggestion in Royer's Statement of Facts, nor was any evidence introduced at Khan's trial, to indicate that any of these co-conspirators traveled to the front lines or engaged in active fire. Although these co-defendants' actions occurred at the periphery of violent actions undertaken by others, including other co-conspirators and LET members, none of the actions involved either one of these four men actually using force or a substantial risk that any of these four men would use force. Accordingly, the Court finds that Kwon's, Hasan's, Aatique's, and Khan's § 371 violation does not constitute a crime of violence under § 924(c)(3)(B), which means that Royer may not be held liable for aiding and abetting their commission of a § 924(c) violation.

---

that the relevant inquiry is not whether there is a risk of <u>any</u> person using force in any way tangentially related to an on-going offense, but rather whether there is a substantial risk of the <u>defendant</u> doing so." (emphasis in original)). This case is slightly different from the cases envisioned by the government and the Fourth Circuit, because Royer did not plead guilty to a substantive § 924(c) offense but instead pleaded guilty to aiding and abetting the commission of a § 924(c) offense that was substantively committed by co-defendants Khan, Kwon, Aatique, and Hasan. Accordingly, to determine whether Royer's conviction for aiding and abetting his co-defendants' § 924(c) violation can pass muster under the conduct-specific approach, the Court must determine whether his co-defendants engaged in a substantive violation of § 924(c). Therefore, under the conduct-specific approach, the Court's task is to examine the co-defendants' conduct in committing a violation of § 371 to determine whether this conduct presented a substantial risk that force would be used against the person or property of another.

### E. Facial Vagueness Challenge

Next, the government argues that Royer may not bring a facial challenge to §

924(c)(3)(B) because "[o]utside of the First Amendment context, a person 'who engages in some

conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the

conduct of others.'" Gov't Mem. 28-29 (quoting Holder v. Humanitarian Law Project, 561 U.S.

1, 18-19 (2010)). According to the government, Royer's conduct "falls within the 'core' of

Section 924(c)(3)(B) because it manifestly 'involves a substantial risk that physical force against

the person or property of another may be used in the course of committing the offense.'" Id. at 29

(quoting 18 U.S.C. § 924(c)(3)(B)). As such, the government argues that Royer cannot challenge

§ 924(c)(3)(B) as void for vagueness.

Whatever merit the government's argument may have in other contexts, Johnson and

Dimaya foreclose its application here for two reasons. First, in both cases, the Supreme Court did

not engage in any discussion of whether Johnson's or Dimaya's specific underlying offense[19] fell

within the "core" of the statute but instead allowed Johnson and Dimaya to bring their facial

constitutional challenges without any regard to the relationship between their specific offenses

and the residual clause in question.[20] Accordingly, the Supreme Court has at least implicitly

rejected the idea that only individuals whose underlying offenses are not at the "core" of the

---

[19] Both decisions merely mention the underlying offense in passing. In Johnson, the defendant, who was described as a "felon with a long criminal record" with ties to white supremacist organizations, had told undercover agents that he had manufactured explosives and planned to attack various sites. He was convicted of the Minnesota state offense of unlawful possession of a short-barreled shotgun. Johnson, 135 S. Ct. at 2556. In Dimaya, the alien was twice convicted of first-degree burglary under California law. Dimaya, 138 S. Ct. at 1209.

[20] Indeed, in Dimaya, Justice Thomas explicitly argued in dissent that "outside the First Amendment context, a challenger must prove that the statute is vague as applied to him" and that "§ 16(b) is not vague as applied to" Dimaya. Dimaya, 138 S. Ct. at 1250 (Thomas, J., dissenting). The Court's implicit rejection of this argument provides even stronger assurances that, whatever the limits of this rule, it does not apply to an individual bringing a vagueness challenge to a statute like § 16(b) or § 924(c)(3)(B).

residual clause may bring a facial vagueness challenge to the statute. Second, in both cases, the Supreme Court did not interpret the residual clause in question narrowly to allow it to apply constitutionally to a "core" group of offenses. Instead, the Court held that the entire residual clause is void for vagueness and, therefore, is wholly unenforceable. This categorical holding suggests that, at least with respect to statutes that share the problematic features of the residual clauses in § 16(b) and § 924(e), the appropriate mode of analysis focuses on the vagueness of the statute as a whole rather than on whether any specific offense clearly falls within its ambit. Because the Court must analyze the clause as a whole and Royer was convicted under § 924(c), he has standing to bring his constitutional challenge.[21]

Lastly, even if the government were correct that Royer would only have standing to challenge the constitutionality of the residual clause if his conduct fell outside of the "core" of § 924(c)(3)(B), Royer's motion could still proceed. As was discussed above, the specific conduct related to the predicate offense underlying Royer's § 924(c) conviction did not involve "a

---

[21] This conclusion is reinforced by the <u>Johnson</u> majority and Justice Gorsuch's <u>Dimaya</u> concurrence, both of which engage with the government's argument in those cases that there "will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury to another." <u>Johnson</u>, 135 S. Ct. at 2560. As those opinions explain, many offenses that seem "easy turn out not to be so easy after all." <u>Id.</u> For example, in <u>Johnson,</u> the government offered as an "easy" case Connecticut's offense of "rioting at a correctional institution," which "certainly sounds like a violent felony—until one realizes that Connecticut defines this offense to include taking part in 'any disorder, disturbance, strike, riot, or other organized disobedience to the rules and regulations' of the prison." As the Court observed, it is unclear whether "ordinary" prison "disorder" involves "a full-fledged prison riot, a food-fight in the prison cafeteria, or a passive and nonviolent act such as disregarding an order to move." <u>Id.</u> (internal quotation marks and alteration omitted). Similarly, Justice Gorsuch observed in <u>Dimaya</u> that it is unclear whether "a conviction for witness tampering ordinarily involve[s] a threat to the kneecaps or just the promise of a bribe" or whether "a conviction for kidnapping ordinarily involve[s] throwing someone into a car trunk or a noncustodial parent picking up a child from daycare." <u>Dimaya</u>, 138 S. Ct. at 1232 (Gorsuch, J., concurring in part and concurring in the judgment). As these examples demonstrate, even if the government were correct that a defendant whose predicate offense falls within the "core" of § 924(c)(3)(B) should not be able to bring a facial challenge to the residual clause, it is not at all obvious whether any particular offense falls within this claimed "core."

substantial risk that physical force against the person or property of another may be used in committing the offense," which means that this actual conduct was not within the "core" group of conduct encompassed by the statute and Royer may challenge the constitutionality of § 924(c)(3)(B).[22]

### F. Mootness

Lastly, the government argues, without citation to any authority, that Royer's motion is moot "because he is out of prison on supervised release, and his supervised release would not change even if Section 924(c)(3) were determined to be unconstitutionally vague." Gov't Mem. 29-30. This argument is unpersuasive. First, Royer's release from the custody of the Bureau of Prisons does not itself make him ineligible to bring a motion under § 2255. A § 2255 motion is available to any "prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States" and the Fourth Circuit has squarely held that a "prisoner on supervised release is considered to be 'in custody' for purposes of a § 2255 motion." United States v. Pregent, 190 F.3d 279, 283 (4th Cir. 1999). Second, although Royer's two terms of supervised release run concurrently with each other, he still has a sufficient stake in

---

[22] The government also contends that Royer's "sweeping vagueness challenge makes especially little sense in" this case because he pleaded guilty "and thus admitted at his change-of-plea hearing that he understood the charges against him." Gov't Mem. 29. This argument is unpersuasive because when movant's claim is properly understood as a facial attack on § 924(c)(3)(B) rather than an attack only on the statute's application to his circumstances, this argument has no force. Moreover, barring Royer's challenge on this basis would conflict with the Supreme Court's recent residual clause jurisprudence, where the Court has granted relief even to individuals who pleaded guilty and did not claim at the time that they did not understand the residual clause. See Welch v. United States, 136 S. Ct. 1257 (2016) (holding that Johnson applied retroactively on collateral review to a prisoner who had pleaded guilty and discussed the nature of the ACCA enhancement during the plea colloquy without claiming that he did not understand it, see 12/14/2010 Tr. [Dkt. No. 55], United States v. Welch, No. 0:09-cr-60212 (S.D. Fla.), and who had not raised a vagueness challenge on direct appeal, see United States v. Welch, 683 F.3d 1304 (11th Cir. 2012)).

the vacatur of his § 924(c) conviction such that his § 2255 motion is not moot. Specifically,

"[f]elony convictions carry a myriad of collateral consequences," including "the possibility that a

future sentence will be enhanced based on the challenged conviction, the possibility of using the

conviction for future impeachment, and societal stigma," as well as the imposition of "a

mandatory special assessment which constituted additional punishment that would not have been

imposed absent a conviction." Adams, 814 F.3d at 181 n.1. Accordingly, "[b]ecause an

erroneous conviction and accompanying sentence, even a concurrent sentence, can have

significant collateral consequences," id., Royer's concurrent term of supervised release on Count

2, which he is not challenging, does not moot his § 2255 motion.

### III.    CONCLUSION

For the reasons stated above, Royer's Motion to Vacate [Dkt. No. 842] will be granted

and his conviction on Count 1 (aiding and abetting the use and discharge of a firearm during and

in relation to a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c)) will be vacated by an

appropriate Order to be issued with this Memorandum Opinion.

Entered this 2ND day of August, 2018.

Alexandria, Virginia

_____ /s/ _____
Leonie M. Brinkema
United States District Judge